Joseph C. STEFFAN, Plaintiff,

v.

Dick CHENEY, Secretary of Defense, et al., Defendants.

Civ. A. No. 88–3669–OG.

United States District Court, District of Columbia.

Dec. 9, 1991.

Marc Wolinsky, Wachtell, Lipton, Rosen & Katz and Sandra J. Lowe, Lambda Legal Defense and Educ. Fund, Inc., New York City, Calvin Steinmetz, Isicson, Steinmetz & Weinberg, Washington, D.C., for plaintiff.

David M. Glass, Vincent M. Garvey, U.S. Dept. of Justice, Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, Senior District Judge.

This matter is before the Court on defendants' motion for judgment on the pleadings, or in the alternative, for summary judgment. The plaintiff has filed a cross-motion for summary judgment. The case has been fully briefed and argued in open court.

 This suit is about the constitutionality of classifications by the military on the basis of sexual orientation. The plaintiff is suing for his diploma from the Naval Academy, his commission as an Ensign in the United States Navy, a declaration that his resignation was null and void, and for a declaration that the Department of Defense Directives 1332.14 and 1332.30, and all other regulations applied to the plaintiff prohibiting those with a homosexual orientation[1] from serving in the Navy or attending the Naval Academy, are violations of the equal protection component of the fifth amendment to the Constitution.[2]

On the merits, the Court has concluded for the reasons stated below that defendants are entitled to judgment as a matter of law. The Court will therefore grant defendants' motion for summary judgment.

### Background

The plaintiff was a midshipman in good standing at the United States Naval Academy in Annapolis, Maryland, when in March 1987, a few months before his expected graduation, he learned that he was under investigation by the Naval Investigative Service ("NIS") for his alleged homosexuality.[3] The NIS had received a report from the Academy that plaintiff had admitted his homosexuality to another midshipman. Upon learning of the NIS investigation, the plaintiff sought advice from a friend, a Chaplain at the Academy. After plaintiff admitted his homosexuality to the Chaplain, the Chaplain offered to help plead his case for a timely graduation with the Commandant of Midshipmen. This was accomplished, but on March 23, 1987, plaintiff was told by the Commandant that graduation was not going to be possible because of the servicewide regulations promulgated in 1981 under Department of Defense ("DoD") Directive 1332.14, pt. 1, § H, ¶ 1(a), *reprinted in* 32 C.F.R., pt. 41, app.

---

1. Plaintiff and counsel argue that there are definitional problems with the words "homosexual" and "homosexuality." Plaintiff urges use of the term "homosexual orientation" when talking about one's status as a homosexual, one's sexual preference, or one's desires for sexual gratification from those of the same gender. The terms "homosexual conduct" or "homosexual activity" are to be used to talk about sexual bodily contact between members of the same gender designed to elicit a sexual response or give sexual pleasure or gratification, and any other behavior that may induce or make welcome such contact.

2. The Equal Protection Clause of the fourteenth amendment is binding on the federal government, and the defendants in this case, by the fifth amendment's Due Process Clause. *Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Equal protection claims under the fifth amendment are to be treated just as they are under the fourteenth amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 n. 2 (1975).

3. Many of these undisputed facts are taken from earlier opinions in this case. *See Steffan v. Cheney*, 733 F.Supp. 115 (D.D.C.1989) (*"Steffan I"*); and *Steffan v. Cheney*, 920 F.2d 74 (D.C.Cir. 1990) (*"Steffan II"*).

A, which prohibit homosexuals from serving in the Armed Forces.[4]

After hearing from the Commandant himself that graduation was impossible, plaintiff indicated that he would want to leave the Academy "as soon as possible." Def. Motion, 6 (quoting Second Statement of Capt. H.W. Habermeyer, Jr. (Mar. 23, 1987), at 1); see Steffan I, 733 F.Supp. at 116.[5] As a courtesy to an accomplished young man, the Commandant arranged for an expedited review process for plaintiff in order to accommodate his wishes. The Brigade Military Board met the following day, March 24, 1987, to review the Steffan case. At that hearing plaintiff admitted his homosexuality on the record and stated that he did not "desire to be commissioned as an officer of the Naval service by continuing as a midshipman of the Naval Academy." Hearing Transcript (Mar. 24, 1987) (affidavit of Marc Wolinsky, filed October 16, 1989, Ex. K, 6); see Steffan I, 733 F.Supp. at 116. When asked by Captain Habermeyer on March 23, 1987, "Are you willing to state at this time that you are a homosexual?", plaintiff responded, "Yes, sir." Pl. Mem. at 12.[6] At the Brigade Military Performance Board on March 24, 1987, Deputy Commandant, Captain Konetzni asked plaintiff: "I'd like your word, are you a homosexual?" Again plaintiff responded: "Yes, sir." Id. at 15; Wolinsky Aff., Ex. K. at 6.

On April 1, 1987, the Naval Academy Academic Board convened to consider the plaintiff's case. By unanimous vote the Academic Board determined that the plaintiff had "insufficient aptitude to become a commissioned officer in the naval service." Def. Motion at 7, quoting Memorandum from Superintendent to plaintiff (Apr. 1, 1987), at 1. The Superintendent of the Academy wrote the plaintiff a memorandum that same day and advised the plaintiff of his intention to recommend a discharge to the Secretary of the Navy. Id. The Superintendent, however, gave the plaintiff the option of submitting a qualified resignation to the Secretary, in which case the Superintendent would forego submitting his recommendation of discharge. The benefits of resignation were discussed with plaintiff. If he resigned, he would be honorably discharged; if not, his would be an involuntary discharge. It was made clear to plaintiff that an involuntary discharge would have a notation on his record that would indicate the plaintiff was a homosexual, whereas, if he resigned, no such notation would appear. Id. at 7–8.

On April 1, 1987, the plaintiff submitted his qualified resignation.[7] On May 6, 1987, it was accepted by an Assistant Secretary of the Navy. More than eighteen months later, on December 9, 1988, the plaintiff wrote the Secretary of the Navy requesting that his resignation be withdrawn. The present action was filed December 28, 1988. The Secretary denied the request to withdraw the resignation in February of 1989.

## Discussion

### I. EQUAL PROTECTION

This is not a case of first impression. This may be the first time that a student at

---

4. DoD Directive 1332.14 is excerpted at pages 10–11, infra. The Navy has its own regulations that are based on the DoD Directive, namely, Secretary of the Navy Instruction ("SECNAVINST") 1900.9C, 1920.4A, 1920.6A, Naval Military Personnel Command Instruction ("NAVMILPERSCOMINS") 1910.1C, and Naval Military Personnel Manual ("MILPERSMAN") 3630400. In addition, the Naval Academy has regulations that grew out of the DoD Directive, for example, Commandant of Midshipmen Instruction ("COMDTMIDNINST") 1610.6F, § 2.15.3.

5. "Def. Motion" is the Defendants' Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment, filed February 8, 1991.

6. "Pl. Mem." is the Memorandum of Law in Support of Plaintiff's Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Judgment on the Pleadings or, in the alternative, Summary Judgment, filed August 29, 1991.

7. A "qualified" resignation is one that is conditioned on something. In this case the resignation was qualified in the sense that it was in lieu of the Superintendent's recommendation of discharge based on plaintiff's insufficient aptitude for commissioned naval service, as determined by the Academic Board. Memorandum from Superintendent to plaintiff (Apr. 1, 1987), at 1.

one of the service academies of the United States Armed Forces was not permitted to graduate because of his admitted status as a homosexual, but it is certainly not the first time that the regulations in question have been reviewed for their lawfulness on an equal protection challenge under the fifth amendment. *See Ben–Shalom v. Marsh,* 881 F.2d 454 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (lesbian denied re-enlistment in Army); *Dronenburg v. Zech,* 741 F.2d 1388 (D.C.Cir.1984) (Naval petty officer discharged for admitted homosexual conduct with recruit on Navy property); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir. 1990) (class of homosexuals working in defense industries subject to expanded investigations for security clearances); *Woodward v. United States,* 871 F.2d 1068 (Fed. Cir.1989) (Navy reserve released from active duty after being seen associating with an enlisted man awaiting discharge for homosexuality); *Rich v. Secretary of Army,* 735 F.2d 1220 (10th Cir.1984) (serviceman honorably discharged for fraudulent enlistment when Army later learned he was homosexual despite earlier denial upon enlistment).

The plaintiff maintains that homosexuals, gay men and lesbians if you will, are a "suspect" or "quasi-suspect"[8] class of persons who as a result of such classification are entitled to have the government action complained of, or regulation as applied as in this case, subject to a form of heightened scrutiny on an equal protection challenge. Plaintiff seeks to distinguish all of the cases cited above, as well as others, on the grounds that each involved some kind of homosexual *conduct,* while in this case

it is the plaintiff's *status* as a homosexual that is at issue.

■ From the landmark classification case of *Cleburne v. Cleburne Living Center, Inc.,* there are three recognized levels of review that are used in equal protection cases: "strict scrutiny," "heightened review" (also called "intermediate scrutiny") and rational basis review. *Cleburne,* 473 U.S. at 440–42, 105 S.Ct. at 3254–58. As stated in *Ben–Shalom v. Marsh,* "[i]n general, a government regulation will be presumed to be valid under equal protection analysis as long as the classification drawn by the regulation 'rationally furthers some legitimate, articulated state purpose.'" *Ben–Shalom,* 881 F.2d at 463 (quoting *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) (legislative classification of state prisoners denying them credit for "good time" during presentence incarceration in county jails upheld on equal protection challenge)).

■ Rational basis review is a deferential standard of scrutiny that is "grounded in a constitutional presumption that 'improvident [classifications] will eventually be rectified by the democratic processes.'" *Ben–Shalom,* 881 F.2d at 463 (quoting *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254). The warning in *Cleburne* is clear, however. When government conduct or a regulation makes classifications that are based on "factors which are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy," then a form of heightened scrutiny is used in lieu of rational basis review. *Id.*

In the case at bar, as in *Ben–Shalom,* the issue has been a bit clouded by a de-

---

**8.** This term was used by the United States Court of Appeals for the Fifth Circuit in its reversal of the district court in *Cleburne Living Center, Inc. v. Cleburne,* 726 F.2d 191, 193 (5th Cir.1984), *aff'd in part and vacated in part,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (appropriate zoning for home for mentally retarded). As used, the term denotes a class of persons who are entitled to a form of heightened review, but not strict scrutiny. The standard sought by the Fifth Circuit was the same one furthered in *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), and *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which hold that a gender classification will fail under this heightened review unless the classification is substantially related to a sufficiently important government interest. Writing for the Supreme Court reversing the Fifth Circuit, Justice White used the term often and without disapproval. *Cleburne,* 473 U.S. at 435, 437, 442, 105 S.Ct. at 3251, 3252, 3255.

bate and discovery over whether the defendants' classification of the plaintiff went to his *conduct* as a homosexual or his *status* as a homosexual. The ongoing NIS investigation of plaintiff's homosexual conduct was discontinued upon the acceptance of his resignation from the Navy. Plaintiff declined to answer questions at deposition about whether he had engaged in homosexual conduct at the Academy. As a result, this is primarily a case about the plaintiff's status as a homosexual.

### A. Homosexuals not a "Suspect" or "Quasi-suspect" Class

The district court in *Ben–Shalom* held that homosexuals were a suspect class, a holding which was subsequently reversed by the Seventh Circuit. *Ben–Shalom*, 881 F.2d at 463–64. There is ample authority to support the defendants' position in this case that those with a homosexual orientation are not a suspect class. *Id.; Rich*, 735 F.2d at 1229; *National Gay Task Force v. Board of Education*, 729 F.2d 1270, 1273 (10th Cir.1984), *aff'd*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985); *Hatheway v. Secretary of Army*, 641 F.2d 1376, 1382 (9th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *DeSantis v. Pacific Telephone & Telegraph Co.*, 608 F.2d 327, 333 (9th Cir.1979).

The best way, however, to determine if the plaintiff is a member of a suspect class is to review the analysis used in *Bowen v. Gilliard*, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) (equal protection heightened scrutiny inapplicable where amendment to welfare legislation intruded on family living arrangements). *See Cleburne*, 473 U.S. at 442–47, 105 S.Ct. at 3255–58.

Under *Bowen* the plaintiff must: 1) have suffered a history of discrimination; 2) exhibit obvious, immutable, or distinguishing characteristics that define him as a member of a discrete group; and 3) show that the group is a minority or politically powerless, or alternatively show that the statu-tory classification at issue burdens a fundamental right. *Bowen*, 483 U.S. at 602–03, 107 S.Ct. at 3017–18 (citing *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (eligibility and benefit levels in federal food stamp program determined on "household" basis rather than individual basis such that close relatives were not "suspect" or "quasi-suspect" class)).

### 1. History of Discrimination

■ Using the *Bowen* test then, plaintiff alleges that those with a homosexual orientation have, in fact, suffered a history of discrimination. *See High Tech Gays*, 895 F.2d at 573.

The court in *Ben–Shalom* however, held that discrimination was *not* responsible for the military's policy of excluding homosexuals. With reference to the concurring opinion of Norris, J., in *Watkins v. United States Army*, 875 F.2d 699 (9th Cir.1989) (en banc),[9] the Seventh Circuit said: "Homosexuals have suffered a history of discrimination and still do, though possibly now to a less degree. We do not see, however, that the new regulation embodies a gross unfairness in the military context so inconsistent with equal protection as to be termed 'invidious.'" *Ben–Shalom*, 881 F.2d at 465–66 (footnote omitted).

### 2. Distinguishing Characteristics

The next question concerns obvious, immutable or distinguishing characteristics that define those with a homosexual orientation as a discrete or separate group. Plaintiff argues eloquently that there is no way to distinguish those persons with a homosexual orientation by way of performance of their duties. The plaintiff himself is an example of this point; academically he was in the top ten percent of his class at the Academy, and he was slated for one of the most prestigious assignments after graduation, duty on a nuclear submarine. Beyond all that, he is a talented young performer and singer who made the Academy and our country proud on several occa-

---

**9.** *Watkins v. United States Army*, 847 F.2d 1329 (9th Cir.), *reh'g ordered*, 847 F.2d 1362 (1988), *opinion withdrawn on reh'g*, 875 F.2d 699

(1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).

sions.[10] It can fairly be said that there is nothing obvious or distinguishing about plaintiff's homosexual orientation which sets him apart.

Even if it were maintained that his sexual preference for men was a distinguishing characteristic, nothing in the record indicates that the plaintiff overtly "exhibited" such a characteristic. In fact, he kept his sexual preference secret between the time he determined his preference in his third class (second or sophomore) year, and February or March of 1987 when he told a fellow midshipman, despite knowing all the while that the DoD and the Academy had regulations prohibiting homosexual orientation or conduct.[11]

**10.** Plaintiff was the lead soloist for the Naval Academy Glee Club, the President of the Catholic Choir at Annapolis, and he sang the National Anthem before the Army–Navy football game in his first class (fourth or senior) year in front of a nationally televised audience.

**11.** March of 1987 was during plaintiff's first class (senior) year. Plaintiff argues under Section 706(2)(A) of the Administrative Procedure Act ("APA") that he has not been treated fairly by the Naval Academy, and that the Navy has acted in an arbitrary and capricious manner since there were ten (10) other midshipmen that year who were allowed to graduate, but who, because of various medical conditions discovered that year, were not commissioned in the Navy. Pl. Mem. at 86–92.

On the issue of immutability, discussed *infra,* plaintiff argues that homosexuality is not in fact a disease or illness of any kind. He says the scientific literature is clear on this point. If so, he is distinguishable under the Naval Academy Regulations which do not forbid graduation of midshipmen who have medical conditions which cause them not to be commissioned. COMDTMIDNINST 1610.6F, § 2.15.3. Furthermore, plaintiff admits that he "discovered" his "condition" during his third class year which, if known to the Academy, under the Regulations would have caused a similarly situated midshipman with a medical condition to be discharged. *Id.*

Plaintiff also argues that his resignation was obtained within the time period of one week while the Navy has as its goal the period of four months to process a discharge on the grounds of homosexuality. Pl. Mem. at 92. The speed of plaintiff's discharge proceedings and subsequent resignation, he argues, amounts to arbitrary and capricious action on the part of the Navy. *Id.*

Because plaintiff had indicated that he did not desire to be commissioned in the Navy, that he

### 3. Immutability

Whether homosexual orientation is an immutable characteristic is difficult to analyze. The Federal Circuit in *Woodward* found homosexuality to be "primarily behavioral in nature." *Woodward,* 871 F.2d at 1076. In *High Tech Gays* the Ninth Circuit came to a similar conclusion. *High Tech Gays,* 895 F.2d at 573–74. Each of those cases, however, dealt with fact situations where some homosexual conduct was part of the record. This case is different. The Court is, however, convinced that homosexual orientation is neither conclusively mutable nor immutable since the scientific community is still quite at sea on the causes of homosexuality, its permanence, its prevalence, and its definition.[12]

was a homosexual, and that since graduation was impossible he would have to leave the Academy, it was neither arbitrary nor capricious for the Navy, as an accommodation to an accomplished young man, to save him the embarrassment and expense of duplicative, longer and more protracted discharge proceedings.

**12.** There is a continuum of sexuality recognized by the DoD and Navy regulations. For example, a midshipman who had only once engaged in some homosexual activity out of curiosity or due to intoxication, but who otherwise demonstrated indicia of heterosexual orientation, would normally be retained at the Academy. SECNAVINST 1920.6A, § 1, ¶ b, (3)(a)*1–2;* MILPERSMAN 3630400, § 2, ¶ a(1)–(2). *See Watkins,* 847 F.2d at 1338–39.

The scientific literature on this subject suggests that there are those with a strict heterosexual orientation and whose lives and sexual experiences are strictly consistent with that orientation. On the other end of the spectrum, there are those who have a homosexual orientation and who have had nothing but homosexual sexual activity in their lives. A. Kinsey, W. Pomeroy & C. Martin, Sexual Behavior in the Human Male 638–41 (1948) (hereinafter Kinsey). The great "in between" includes most lesbians, and bisexual men whether they have a homosexual or a heterosexual orientation. Note, *The Tradition of Prejudice versus the Principle of Equality: Homosexuals and Heightened Equal Protection Scrutiny after* Bowers v. Hardwick, 31 B.C.L.Rev. 375, 378 n. 24, 379 n. 25 (1990).

It is surely true that there are many stories behind why a particular individual has a homosexual orientation. It is not at all clear, as a scientific matter, whether one *chooses* one's sexual orientation or not. *See* Review, *Really, Dr. Kinsey?,* 337 The Lancet (British Medical Journal), 547, 547 (1991) (citing Judith A. Reisman & Edward W. Eichel, Kinsey, Sex and Fraud:

On the matter of suspect classifications, the Supreme Court seems to focus on the question of whether an individual *chooses* the characteristic that defines the class or not. *Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982); *Cleburne*, 473 U.S. at 441, 105 S.Ct. at 3255 (quoting *Mathews v. Lucas*, 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976)). One's race is determined genetically, and one's gender is—unless there is new evidence worthy of a Nobel prize—commonly believed to be a random event. *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion). One's national or ethnic origin and whether one was born out of wedlock are characteristics similarly not subject to choice by the person being so classified. In the *Plyler* case, the Supreme Court subjected a Texas statute denying public school education to children of illegal aliens to heightened scrutiny and found that Texas had denied the children their right to equal protection of the laws. 457 U.S. at 205, 230, 102 S.Ct. at 2388, 2401. The Court noted that illegal aliens who are adults are not a suspect class since the conduct that defines the class is unlawful, and their status as illegal and as aliens is not immutable. Minor children of illegal aliens, on the other hand, do not consciously choose their status, nor can they very well alter it by leaving the country on their own accord. *Id.* at 219–220, 102 S.Ct. at 2395–96.

Seeing how the choice of the characteristic influences the decision on whether or not the class that bears the characteristic is "suspect" or "quasi-suspect," the Court turns to the case at bar. Homosexual orientation, plaintiff asserts, is not a matter of choice. Pl. Mem. at 47–49. Defendants, on the other hand, agree with the Federal Circuit in *Woodward* that the characteristic is primarily behavioral in nature, and that if man is a mammal in control of his own behavior, he therefore chooses his sexual orientation. As aforementioned, the scientific community is unclear and unsure about many of the causes and attributes of sexual orientation. It is not for this Court to say definitively whether sexual orientation is *always* chosen by the individual, but it is apparent that *sometimes* it is chosen. This realization puts sexual orientation closer to the category of alien adults who are not a suspect class under *Plyler*, than to their children who did not choose their status.

### 4. Fundamental Rights

On the question of a fundamental right, in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Supreme Court upheld a Georgia criminal sodomy statute as applied to a consenting adult homosexual male found engaging in homosexual sodomy in his home. It was determined in *Bowers* that there was no fundamental right to engage in that kind of activity. *Id.* at 192, 106 S.Ct. at 2844. Since plaintiff does not maintain that he has a fundamental right to have a homosexual orientation under the Constitution, we need not reach that issue.[13]

### 5. Political Power

■ The last issue concerning a suspect class is political powerlessness. Even *if* it were proven that homosexual orientation was immutable, or indeed, not subject to individual choice, it is still very clear that homosexuals as a class enjoy a good deal of political power in our society, not only with respect to themselves, but also with

The Indoctrination of a People (John H. Court & J. Gordon Muir eds., 1990) (Kinsey reports on male/female sexuality sharply criticized due to improper knowingly unethical use of unrepresentative populations)); Review, *Kinsey's Sexreport: Dubious, Misleading, Fraud?*, German Medical Tribune, July, 19, 1991, at 1, 6 (Jurgen Benning trans.) (same). No choice in the matter would argue for a conclusion of immutability, while some choice or a great deal of choice would tend to support a finding of mutability.

Without a definitive answer at hand, yet confident that *some* people exercise *some* choice in their own sexual orientation, the Court does not regard homosexuality as being an immutable characteristic.

13. *See* Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection*, 55 U.Chi.L.Rev. 1161 (1988) (arguing that due process-derived privacy rights do not bear on equal protection principles).

respect to · issues of the day that affect them.[14]

It is beyond doubt that the homosexual community has been able to reach out and gain · the attention of politicians of all sorts.[15] One need only remember St. Patrick's Day 1991 in New York City to see Mayor David Dinkins marching in the traditionally Irish–Catholic parade with · homosexual groups and activists who were im-

**14.** The latest statistics available, of which this Court takes judicial notice, show that 59% of adults and adolescents with the Human Immunodeficiency Virus ("HIV") contracted it through homosexual sodomy among males. Department of Health and Human Services, Public Health Service, Centers for Disease Control, National Center for Infectious Diseases, Division of HIV/AIDS, "HIV/AIDS Surveillance," September 1991, 9–11 [hereinafter CDC Report]. The HIV is a virus which causes the Acquired Immune Deficiency Syndrome ("AIDS"). Homosexual activist groups have been highly involved in federal, state and local efforts to deal with the epidemic. *See, e.g.,* Jason DeParle, *Rude, Rash, Effective, Act–Up Shifts AIDS Policy,* N.Y. Times, Jan. 3, 1990, B1, col. 2, B4, col. 1 (AIDS Coalition To Unleash Power—"ACT–UP"—well heeded by policymakers because of aggressive tactics); Bruce Lambert, *In Gay Parade, Pause to Recall AIDS Deaths,* N.Y. Times, July 1, 1991, B1, col. 5, B3, col. 1 (70,000 marchers and 200,000 onlookers for annual Gay and Lesbian Parade in New York City); Philip T. Hilts, *Landmark Accord Promises to Ease Immigration Curbs,* N.Y. Times, Oct. 26, 1990, A1, col. 4, A24, col. 1 (Lambda Legal Defense and Education Fund and Rep. Barney Frank helped get homosexuals and those· with AIDS reduced restrictions on immigration); and Robert Pear, *Congress Authorizes $875 Million to Fight AIDS in Hard–Hit Areas,* N.Y. Times, Aug. 4, 1990, L1, col. 1 (despite no support from · the President, authorization passed 95 to 4 in the Senate, and 408 to 14 in the House).

This is not to imply that only homosexuals will benefit from a solution to the HIV crisis, but simply to say that homosexual groups have been well publicized, heard and heeded by the political branches of our federal, state and local governments when it has come to dealing with the HIV epidemic and other related issues.

**15.** Atlanta, Boston, Chicago, Los Angeles, New York, Philadelphia, San Francisco, and Seattle are just some of the cities that have passed anti-discrimination regulations concerning homosexuals. California, Michigan, New York and Wisconsin all have various statewide legislation or regulations which benefit homosexual groups. Cal.Civ.Code § 51.7 (West 1984) (prohibiting violence against person or property based on sexual orientation); Mich.Comp.Laws Ann. § 333.-20201(2)(a) (barring denial of health facilities on account of sexual orientation); N.Y.Comp. Codes R. & Regs. tit. 4, § 28 (1983) (prohibiting Executive from discrinminating in state employment or provision of state services on account of sexual orientation); and Wis.Stat.Ann. §§ 111.31–.395 (West 1988) (comprehensive statute against employment discrimination on basis of sexual orientation). *Developments in the Law—Sexual Orientation and the Law,* 102 Harv.L.Rev. 1509, 1667–68 nn. 49–51 (1989). *See* Kirk Johnson, *Connecticut Senate Passes Law Protecting Gay Rights,* N.Y. Times, Apr. 18. 1991, B1, col. 2; and Sam Howe Verhovek, *Cuomo Proposes Gay–Rights Bill,* N.Y. Times, Apr. 24, 1991, B2, col. 4 (Governor of New York seeks to accomplish same measure as passed in neighboring Connecticut protecting homosexuals from discrimination).

In *Jantz v. Muci,* 759 F.Supp. 1543 (D.Kan. 1991), the plaintiff was an applicant for a position as a public school teacher who had claimed that he was denied the position because of the principal's perception that he had "homosexual tendencies." Defendant's motion for summary judgment was denied because there was a material fact as to why plaintiff was not hired. In so holding, the district judge found the classification of those with a homosexual orientation to be inherently suspect. *Id.* at 1551. Finding homosexuals as a class to be powerless politically, the *Jantz* court criticized the Ninth Circuit for its contrary holding in *High Tech Gays. Id.* at 1549 (citing *High Tech Gays,* 895 F.2d at 574).

The basis of this criticism was the Ninth Circuit's citation of various state statutes which were taken from some footnotes in the Harvard Law Review piece cited above. The *Jantz* court complains that the Ninth Circuit ignored the text of that piece which said, among other things: "Unfortunately, very little legislation protects gay men and lesbians from discrimination in the private sector. No federal statute bars discrimination by private citizens or organizations on the basis of sexual orientation. Nor do the states provide such protection: only Wisconsin has a comprehensive statute barring such discrimination in employment." *Jantz,* 759 F.Supp. at 1550 (quoting *Developments in the Law—Sexual Orientation and the Law,* 102 Harv.L.Rev. at 1667).

·In the first place, *Jantz* is a decision against the teaching of its own Court of Appeals for the Tenth Circuit. In *Rich v. Secretary of the Army,* classifications based on choice of sexual partner were held not to be suspect. *Rich,* 735 F.2d at 1229. Secondly, and more to the point, just because some students in Cambridge, Massachusetts say it, does not make it so. Based on the evidence of legislation, ordinances and obvious political trends, both *High Tech Gays* and this decision are justified in their conclusions that homosexuals are gaining in political stature, despite opinion to the contrary.

portant supporters during his tough mayoral campaign.[16] There are many other important and high visibility issues which have brought the homosexual community into the political landscape in this country and in the states, not the least of which is the AIDS epidemic and the related issues of funding for research and drugs, school attendance for children who are HIV-positive, and insurance coverage for victims.

Assuming *arguendo* that there is continuing antipathy and prejudice exhibited towards the plaintiff's class, it cannot successfully be maintained that the political branches are not paying attention to homosexuals or those who advocate legislation favorable to them. Just because there are only a few members of Congress who are openly homosexual does not mean that homosexuals as a class are without influence. There are not many medical doctors in Congress either, and yet that profession is exceptionally well represented on Capitol Hill.[17] It is far more important to notice that references to sexual orientation, sexual preference and AIDS show up from time to time in the law of the various states, localities, and in the federal law.[18]

In *Ben–Shalom*, the court was succinct:

In these times, homosexuals are proving that they are not without growing political power. It cannot be said "they have no ability to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445, 105 S.Ct. at 3257. A political approach is open to them to seek a congressional determination about rejection of homosexuals by the Army. We are, however, unwilling to substitute a mere judge-made rule for the Army's regulation or to act in an executive or legislative fashion.

*Ben–Shalom*, 881 F.2d at 465–66.

The example of political power exercised by the plaintiff that is most readily available is the discovery phase of this very case. Thirty-two Members of Congress personally signed a letter written by Congressman Studds urging the Secretary of Defense, a defendant in this case, to comply with certain discovery requests.[19] Letter from Gerry E. Studds, *et al.*, to Dick Cheney (June 28, 1991), 2. Given that plaintiff and the homosexual community have been able to move well and gain attention in political circles, under *Bowen* then, plaintiff has not been able to show that he is a member of a suspect class.

As a final note on this subject of whether plaintiff is a member of a suspect class, in *Cleburne* Justice White raised the question of whether there is a principled way to distinguish between the plaintiff's class and others, for example, the aging, the infirm, or the mentally ill. *Cleburne*, 473 U.S. at 445–46, 105 S.Ct. at 3257–58. All these groups suffer from some form of discrimination, they all have immutable characteristics which set them apart from most other people, and they all have a diminished capacity to mandate legislative responses helpful to their class. The Supreme Court in *Cleburne* specifically declined the opportunity of walking down that difficult path with respect to the aging and other groups. *Id.; see Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (declining to hold that classifications based on age are suspect).

---

16. N.Y. Times, March 17, 1991, at 1, col. 2 and 34, col. 1; March 18, 1991, at B1, col. 2 and B3, col. 1.

17. There are five Members of Congress who are doctors; a pharmacist, a dentist, a general physician, a psychiatrist, and a veterinarian. Cong. Q., *Who's Who in Congress,* 1991–1992, 102d Congress (1991).

18. *See supra* note 15. In the federal law AIDS has an extensive and comprehensive treatment in Title 42. 42 U.S.C.A. §§ 300cc–, 300dd–21–, 300ee–, 300ff– (West 1991). Section 300cc *et seq.* deals with AIDS Research, § 300dd–21 *et seq.* with AIDS Health Services, § 300ee *et seq.* with Prevention, and § 300ff *et seq.* with HIV Health Care. *Id.*

19. In *Cleburne,* Justice White gave an indication of what was meant by political powerlessness. The mentally retarded were held not to be "politically powerless in the sense that they have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at 445, 105 S.Ct. at 3257.

Putting aside the conclusions above for the sake of argument, even if plaintiff could satisfy the requirements for suspect classification under *Bowen*, nothing has been presented by him which suggests a difference relevant to an equal protection analysis between those with a homosexual orientation and the aging, for example. Both classes have suffered historical discrimination on a variety of levels in society and in many forms. Both characteristics which define the class are arguably immutable. And it is argued that both groups suffer from underrepresentation in Congress and general political powerlessness. Yet the Supreme Court specifically declined to extend the fifth amendment equal protection considerations to include groups like the aging and the mentally retarded. *Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3257. Classification principles established in *Cleburne* are equally applicable to non-practicing homosexuals.

Given the clear logic of this analysis and the weight of authority, no lower federal court could come to another conclusion, but that the plaintiff is not a member of a suspect class entitled to a higher level of judicial scrutiny. Rational basis review is the applicable standard of review for this case.

B. *Rational Basis for the Regulations*

The defendants in this case must show that there is a rational basis for the regulations which caused the plaintiff to be encouraged to resign from the Naval Academy and denied his commission in the Navy. In equal protection cases using rational basis review, the Supreme Court has held that the regulation must bear a rational relationship to a legitimate state end, and "statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). In addition, defendants must articulate the state purpose of the regulation. *McGinnis v. Royster*, 410 U.S. at 270, 93 S.Ct. at 1059.

The Department of Defense Directives 1332.14 and 1332.30 at issue in this case are extracted as follows:

1332.14—January 28, 1982

Enlisted Administrative Separations

*Homosexuality*

1. Basis

a. Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The presence of such members adversely affects the ability of the Military Services to maintain discipline, good order, and morale; to foster mutual trust and confidence among servicemembers, to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; to recruit and retain members of the Military Services; to maintain the public acceptability of military service; and to prevent breaches of security.

b. As used in this action:

(1) Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts;

(2) Bisexual means a person who engages in, desires to engage in, or intends to engage in homosexual and heterosexual acts; and

(3) A homosexual act means bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires.

c. The basis for separation may include preservice, prior service, or current service conduct or statements. A member shall be separated under this section if one or more of the approved findings is made:

(1) The member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts un-

less there are approved further findings that:

(a) Such conduct is a departure from the member's usual and customary behavior;

(b) Such conduct under all the circumstances is unlikely to recur;

(c) Such conduct was not accomplished by use of force, coercion, or intimidation by the member during military service;

(d) Under the particular circumstances of the case, the member's continued presence in the Service is consistent with the interest of the Service in proper discipline, good order, and morale; and

(e) The member does not desire to engage in or intend to engage in homosexual acts.

(2) The member has stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual.

(3) The member has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the persons involved) unless there are further findings that the member is not a homosexual or bisexual and that the purpose of the marriage or attempt was the avoidance or termination of military service.

1332.30—February 12, 1986

Separation of Regular Commissioned Officers for Cause

[This directive is practically identical to the directive above except that it applies to officers in the military instead of enlisted members].

As previously noted, there are Navy service regulations based on these two DoD Directives which differ in wording slightly. The Navy has five such regulations: SECNAVINST 1900.9C, 1920.4A, 1920.6A, NAVMILPERSCOMINS 1910.1C, and MILPERSMAN 3630400. In addition, there are Naval Academy Rules which require the

Superintendent of the Naval Academy to recommend to the Secretary of the Navy, "[u]pon the recommendation of the Academic Board, ... the discharge of those midshipmen who have been found to be deficient in academics or who possess insufficient aptitude for commissioned service." United States Naval Academy Regs., pt. I, § 12010.3.5. There is a list of "problems" which alone are sufficient "to warrant separation from the Naval Academy." COMDTMIDNINST 1610.6F, § 2.15.3 The making of a statement that one is a homosexual is grounds for separation of a midshipman. *Id.*, § 2.15.3(c).

The rationale for these regulations is laid out in DoD Dir. 1332.14, pt. 1, § H, ¶ 1(a), quoted in full above.

Arguing that the DoD Directives at issue are not rational as a matter of law, plaintiff relies heavily on the recent Ninth Circuit decision in *Pruitt v. Cheney,* 943 F.2d 989 (9th Cir.1991), saying that "the Ninth Circuit squarely rejected the position that defendants advance here. *Pruitt,* like this case, presented an Equal Protection challenge to military regulations that require the discharge of servicemembers solely on the basis of homosexual orientation...." Pl. Mem., at 3.

In *Pruitt* the district court granted the defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[20] The Ninth Circuit agreed with the district court that the plaintiff had not stated a first amendment challenge, but disagreed with the district court and concluded that an equal protection claim had been stated. Contrary to the plaintiff's reading, *Pruitt* is not a case where the Ninth Circuit *held* anything other than that the plaintiff had stated an equal protection claim, and remanded the case to the district court for further proceedings.

---

20. The plaintiff in *Pruitt* merely alleged generally in her complaint that the regulations mandating her discharge were unconstitutional. *Pruitt v. Cheney,* 943 F.2d at 993. In her complaint, "[s]he did not articulate an equal protection claim." *Id.*

Now that *Pruitt* has been remanded, the district court will be able to hear the defendants articulate their rationale for the regulation, and the plaintiff will have an opportunity to contest that basis. Presumably the same bases given for the regulations in the present case, will be given by the defendants in *Pruitt* on remand.

Now that *Pruitt* is on remand, the defendants will have to articulate a rational basis for the regulations excluding Pruitt from re-enlistment in the Army. In this case, the defendants have articulated a number of different bases for the regulations that affected plaintiff and his departure from the Naval Academy. The case at bar is procedurally a bit ahead of *Pruitt.* Plaintiff's reliance on it, as a result, is misplaced.

■ To survive rational basis review the government regulation need only "promote a legitimate government interest." *Ben–Shalom*, 881 F.2d at 465. The Army regulation at issue in *Ben–Shalom* was very close in wording to the DoD Directives 1332.14 and 1332.30 of which plaintiff complains. The Seventh Circuit found that the Army regulation *"clearly* promotes a legitimate government interest." *Id.* (emphasis supplied).

■ Surely the government has a legitimate interest in good order and morale, the system of rank and command, and discipline in the Military Services. Judging from Directive 1332.14, it is the determination of the Secretary of Defense and of the Congress of the United States which delegated such rule-making authority, that allowing admitted homosexuals to serve alongside heterosexual members and officers in the Armed Forces would jeopardize morale, discipline and the system of rank and command. Under the deferential standard of rational basis review, we cannot say that these are not in fact legitimate interests, or that the regulations in question do not promote them.

A controlling case in this Circuit is *Dronenburg v. Zech,* 741 F.2d 1388 (D.C.Cir. 1984). In his opinion for the court, Judge Robert Bork gave additional examples of what the military hoped to achieve with this regulation. He wrote:

> This very case illustrates dangers of the sort the Navy is entitled to consider: a 27–year–old petty officer had repeated sexual relations with a 19–year–old seaman recruit. The latter then chose to break off the relationship. Episodes of this sort are certain to be deleterious to morale and discipline, to call into question the evenhandedness of superiors' dealings with lower ranks, to make personal dealings uncomfortable where the relationship is sexually ambiguous, to generate dislike and disapproval among many who find homosexuality morally offensive, and, it must be said, given the powers of military superiors over their inferiors, to enhance the possibility of homosexual seduction.

*Id.* at 1398.

In *Dronenburg* the same Navy regulations at issue in this case were considered rational when the issue was homosexual conduct. *Id.* Of the reasons given by the Court of Appeals, quoted above, as to why the Navy's regulations were rational and the state purposes legitimate, all have equal application to this non-conduct case.

It is worth highlighting that if the Navy accepted those with a homosexual orientation, action plaintiff urges, it may still "generate dislike and disapproval among many who find homosexuality morally offensive." *Id.* Recognizing that the *Dronenburg* court had homosexual conduct in mind rather than homosexual orientation when it spoke of "homosexuality," it has not been shown in this case that lifelong, or even career-long celibacy among those with a homosexual orientation is the rule rather than the exception. This is important because the regulation in question states that:

> The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, *demonstrate a propensity to engage in homosexual conduct,* seriously impairs the accomplishment of the military mission.

DoD Regulation, 1332.14, 1.a (emphasis supplied).

The plaintiff has stated his sexual preference for people of the same gender as himself and has thereby demonstrated a propensity to engage in conduct which both parties agree is clearly regulable under *Dronenburg.* Unless it can be shown that the plaintiff has some commitment to celi-

bate living, the presumption must be, and it is rational for the Navy to believe, that plaintiff could one day have acted on his preferences in violation of regulations prohibiting such conduct.

Plaintiff argues that defendants maintain the regulations in question out of impermissible prejudice towards plaintiff and those similarly situated. Pl. Mem. at 6–8, 58–64. If, however, the Court of Appeals is correct in its conclusion that many would find the Navy's approval of a homosexual orientation among its fighting forces to be morally offensive, then it is not prejudice which is responsible for the regulations, but rather a standard of morality. And so, as Judge Bork so eloquently said in *Dronenburg:* "If the revolution in sexual mores that appellant proclaims is in fact ever to arrive, we think it must arrive through the moral choices of the people and their elected representatives, not through the ukase of this court." *Id.* at 1397. This cogent statement in *Dronenburg* has its constitutional underpinnings in Article I, section 8: "The Congress shall have power * * * * To provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval forces." U.S. Const. art. I, § 8, cl. 13–14.

Finally, a word about the military interest in maintaining a semblance of privacy for its members despite each member's commitment to a career or period of service which affords minimal privacy. DoD Directive 1332.14 states in part, with reference to those who by their statements demonstrate a propensity to engage in homosexual conduct: "The presence of such members adversely affects the ability of the Military Services to ... facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy;...." DoD Dir. 1332.14, pt. 1, § H, ¶ 1(a). In the Military Establishment and for those who attend the Naval Academy, the policy of separating men and women while sleeping, bathing and "using the bathroom" seeks to maintain the privacy of officers and the enlisted when in certain states of undress.[21] The embarrassment of being naked as between the sexes is prevalent because sometimes the other is considered to be a sexual object. The quite rational assumption in the Navy is that with no one present who has a homosexual orientation, men and women alike can undress, sleep, bathe, and use the bathroom without fear or embarrassment that they are being viewed as sexual objects.

## II. HEALTH AND WELFARE OF THE MILITARY

■ There is another justification for the policy of excluding homosexuals from service in the United States Armed Forces, and more precisely, in the United States Navy. Though not mentioned in the papers of either party or indeed in the DoD Directive itself, there is a fact that can be judicially noticed: far and away the highest risk category for those who are HIV-positive, a population who will with a high degree of medical certainty one day contract AIDS, is homosexual men.[22] CDC Report at 9–11.

The taking of judicial notice of facts which justify a certain classification is a

---

**21.** The most significant policy separating the sexes in the Navy is that which excludes women from combat. The so-called "Combat Exclusion Rule," 10 U.S.C. § 6015 (1988), which mandates separate categories for men and women to serve on combat vessels in the Navy, did not violate equal protection under either rational basis review or strict scrutiny. *Kovach v. Middendorf,* 424 F.Supp. 72 (D.Del.1976).

Part of the modern rationale underlying the combat exclusion rule is the avoidance of sexual conduct and pregnancy interfering with combat missions. *See* 137 Cong.Rec. S11418 (daily ed. July 31, 1991) (statement of Sen. Glenn) (raising issue of pregnancy during debate on Senate

Floor). It stands to reason that the categorical exclusion of those with a homosexual orientation from the Navy is, at least in part, while aimed at keeping good order, a way of keeping sexual conduct and desires from interfering with combat duties.

**22.** DoD Directives 1332.14 and 1332.30 were promulgated before the HIV epidemic became a matter of great public concern, or an influence on policymakers or legislators. Health-related issues such as the HIV or AIDS were not, as a matter of historical fact, considered when these directives were given.

time-honored practice under the seminal case *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 56 S.Ct. 159, 82 L.Ed. 138 (1935). Justice Brandeis for a unanimous Court said:

> When such legislative action "is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary."

*Id.* at 185, 56 S.Ct. at 163 (quoting *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281 (1934)). Of course the obvious objection is that the DoD Directive in this case was not a "legislative action." The Court in *Pacific States* continued:

> The question of law may always be raised whether the legislature had power to delegate the authority exercised.... But where the regulation is within the scope of authority delegated, the presumption of the existence of facts justifying its specific exercise attaches alike to statutes, to municipal ordinances, and to orders of administrative bodies.

*Pacific States,* 296 U.S. at 186, 56 S.Ct. at 163 (citations omitted).

In the case at bar, the defendants have argued that military judgments which prohibit homosexuals from serving in the Armed Forces, are, like most military judgments, entitled to deference from the judicial branch. *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). Though *Goldman* was a first amendment case [23] concerning an Orthodox Jewish servicemember's right to wear a yarmulke indoors against regulations under the free exercise clause, defendants in this case quote the *Goldman* Court saying that "... courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 507, 106 S.Ct. at 1313. In *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality opinion), Chief Justice Vinson wrote: "[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the balance which must be struck in this adjustment. The Framers expressly entrusted that task to Congress." *Id.* at 140, 73 S.Ct. at 1048.[24]

Likewise, legislative determinations are entitled to great deference from the judiciary using the rational basis test. In *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), the Supreme Court held that Section 632 of the Foreign Service Act of 1946, a scheme which requires retirement at age 60 for members of the Foreign Service while no mandatory retirement age is established for Civil Service employees, was not a violation of the equal protection component of the Due Process Clause of the fifth amendment. On the issue of deference to the legislature, the Court said:

> men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.
> *Id.* at 93–94, 73 S.Ct. at 540. *See also Department of Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988).

---

**23.** The first amendment is even more strictly construed than the other amendments to the Constitution. *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) (citing *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940)).

**24.** *See Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). In *Orloff* the Supreme Court addressed the question of deference to the military as well as the issue of discrimination in the armed services. For the Court, Justice Jackson wrote:

> We know from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of

The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of *any combination of legitimate purposes* that we can only conclude that the legislature's actions were irrational.

*Id.* at 97, 99 S.Ct. at 942–43 (emphasis supplied).

There are no reasons to "infer antipathy" between Congress and those homosexuals who are not practicing or exhibiting their orientation through sexual conduct in the Armed Forces as such was the case with plaintiff. Congress is, and for most of this century has been, controlled by a majority party which has taken a great deal of pride in giving legislative aid to those groups in society who have been discriminated against, taken advantage of, or downtrodden. Furthermore, Congress and the various state legislatures around the nation have responded to the homosexual community on numerous occasions in the last decade with respect to the HIV epidemic. *See supra* note 15.

**25.** Submitted to the President June 24, 1988. The Commission was familiarly known as the Watkins Commission.

**26.** This report was brought to the attention of respective counsel by the Court during final argument on November 7, 1991. Each was afforded the opportunity to comment. Plaintiff's counsel indicated at oral argument that he did not believe health-related issues to be in the case. Defendants' counsel filed a short comment within a week expressing the view that health-related issues were not originally part of the military's policy of excluding homosexuals, but that they would be considered if re-evaluated.

**27.** The entire War Powers section of the Constitution consists of clauses 11 through 14 as follows:

The Congress shall have power ...
To declare War, grant Letters of Marque and Reprisal, and make Rules concerning captures on Land and Water.

And so it is with deference to the military and its professional judgment, with deference to the legislature, and under the teaching of *Pacific States* that the Court takes judicial notice of the widely praised and accepted final report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic [hereinafter Presidential Report].[25]

In that report it was stated that the HIV "epidemic has predominantly been confined to people participating in behaviors such as homosexual sex and intravenous drug abuse...." Presidential Report at 15. The latest figures available from the Centers for Disease Control show that of the AIDS cases reported through August 1991, 59% of all adults and adolescents were exposed because they were men who had sex with other men. CDC Report at 9, Table 4. Among males, 65% of adults and adolescents were exposed to HIV and subsequently contracted AIDS because of sex with other males. *Id.* at 10, Table 5.[26]

Article I, Section 8, gives the Congress the power to "raise and support Armies, ..." and "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval forces."[27] Implicit in the power to support armies is the power to make rules concerning their health and welfare.

To raise and support Armies, but no Appropriation of money to that Use shall be for a longer Term than two years.
To provide and maintain a Navy.
To make Rules for the Government and Regulation of the land and naval Forces.
U.S. Const. art I, § 8, cl. 11–14.
In *Kovach v. Middendorf,* the district court in Delaware spoke of the War Power of Congress in lofty terms while rejecting an equal protection challenge to the Combat Exclusion Rule for women. Applying strict scrutiny the court said:
The Constitution gives the Congress broad power to provide for the national defense. In so critical an area, the Congress has a compelling state interest on which to justify the classification.... In the absence of qualifications or limitations found in the Constitution or in applicable principles of international law (there are none in the instant case) the war power of Congress knows no bounds.
*Kovach,* 424 F.Supp. at 79 (citing *United States v. MacIntosh,* 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302 (1931)).

Regulations designed to protect the health of the nation's Armed Forces are not new. During World War I, Congress authorized the Secretary of War to make regulations to suppress "houses of ill-fame" in the vicinity of military camps. In *McKinley v. United States*, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919), the plaintiffs in error were convicted of keeping such a house within five (5) miles of a camp, in violation of the regulations. Plainly, since Congress is empowered to raise and support armies, it may do whatever is necessary to protect the health and welfare of those armies, however much its legislation and regulations promulgated pursuant thereto might impinge on what would otherwise be the subject of police power reserved exclusively to the States. *Keller v. United States*, 213 U.S. 138, 29 S.Ct. 470, 53 L.Ed. 737 (1909). The Supreme Court in *McKinley* sustained the convictions.

The power to protect the Armed Forces from venereal disease is ample to sustain the power to protect them from what is now known to be a fatal and incurable virus, the HIV. Given that at least 59% of all those who have contracted HIV have done so due to homosexual or bisexual activity, surely it does not require extended discussion in the dialectic and sterile *cliches* of "how equal the Equal Protection Clause's protection must be," to show that the exclusion of homosexuals from the Armed Forces constitutes a reasonable step towards the protection of those forces' health.

To be sure, there is no evidence in this case about the plaintiff having had sex with anybody, male or female. But the defendants' policy of excluding homosexuals is rational in that it is directed, in part, at preventing those who are at the greatest risk of dying of AIDS from serving in the Navy and the other armed services.[28] This is understandable in light of the overall military mission of defending the Nation. The interest we as a Nation have in a

healthy military cannot be underestimated or discounted.

### Conclusion

The Department of Defense's regulations that prohibit homosexuals from serving in the Navy and the other armed services establish classifications that rationally further legitimate state purposes. Those purposes include the maintenance of discipline, morale, good order, a respected system of rank and command, a healthy military force, morality and respect for the privacy interests of both officers and the enlisted. Plaintiff is not a member of a suspect class entitled to heightened scrutiny. Under the deferential standard of rational basis review, coupled with judicial deference to the military and the legislature, the regulations in question are not violative of the equal protection component of the Due Process Clause of the fifth amendment. The Court reaches these conclusions without reference to the final report of the Presidential Commission on the HIV (Watkins Report), the Center for Disease Control statistics or the *Pacific States* precedent; however, it notes that these factors strengthen the conclusions heretofore reached.

---

**28.** Again, this is not to imply that all persons are not potentially at risk of being infected with the HIV, but merely to point out the relative risks. The fact remains that 59% is a much larger risk category for men who engage in homosexual activity than the 10% or so of all persons, male or female, who have the HIV from heterosexual activity. CDC Report at 9, Table 4; 11, Table 6.