Joseph C. **STEFFAN**, Appellant,

v.

Les **ASPIN**, Secretary of Defense, et al.

No. 91–5409.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1993.

Decided Nov. 16, 1993.

Order Granting Rehearing In Banc and Vacating Judgment Jan. 7, 1994.

---

Marc Wolinsky, argued the cause for appellant. With him on the briefs were Lambda Legal Defense and Education Fund, Inc., Norman Redlich, William C. Sterling, Jr., and Vineet Bhatia, Wachtell, Lipton, Rosen & Katz and Calvin Steinmetz, Steinmetz, Weinberg and Moats.

Anthony J. Steinmeyer, Atty., U.S. Dept. of Justice, argued the cause, for appellees. With him on the brief were J. Ramsey Johnson, Acting U.S. Atty., and E. Roy Hawkins, Atty., U.S. Dept. of Justice.

On the brief for amici curiae, the American Jewish Committee was David McBride. With him on the briefs, the Asian–American Legal Defense Fund, the American Jewish Congress and the Puerto Rican Legal Defense Fund.

On the brief for amicus curiae The American Ass'n of University Professors were Robert C. Post, Scott L. Nelson, and Ann H. Franke. Mark D. Laponsky entered an appearance.

On the brief for amici curiae NOW Legal Defense and Educ. Fund, et al., were Deborah A. Ellis and Anne L. Clark.

On the brief for amici curiae The American Civil Liberties Union AIDS Project, et al., were Steven R. Shapiro and Arthur B. Spitzer.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Joseph Steffan was, by all accounts, an exceptional midshipman as he prepared to graduate from the United States Naval Academy in 1987. Mr. Steffan's exemplary performance at the Academy had earned him numerous honors and the respect and praise of his superior officers. Most notably, he was selected in his senior year to serve as Battalion Commander, one of the Academy's ten highest ranking midshipmen. But only six weeks before his expected graduation, the Academy forced Mr. Steffan to resign—denying him a degree and a commission in the Navy—after he truthfully answered, "Yes, sir" to a superior officer's question, "[A]re you a homosexual?" In dismissing Mr. Steffan, the Academy applied Department of Defense Directives instructing that "[h]omosexuality is incompatible with military service," and mandating discharge of any servicemember who "has stated that he or she is a homosexual or bisexual, unless there is a further finding that the member is not a homosexual or bisexual." 32 C.F.R. Part 41, App.A §§ H.1.a, H.1.c(2). Mr. Steffan argues that his constructive discharge, based solely on his homosexual orientation, violates the equal protection component of the Fifth Amendment's Due Process Clause. He further argues that the truncated procedures the Navy used in effecting that discharge were arbitrary and capricious, violating both the equal protection component and the Administrative Procedure Act.

Because we find no rational basis for the Directives under which the Navy excluded Mr. Steffan solely because he truthfully admitted his sexual orientation, we hold that these Directives are facially unconstitutional. We need not and do not decide the alternative procedural claims because, under the plain mandate of the Directives, Mr. Steffan's discharge was inevitable and would have occurred under any procedures through which the Navy may have chosen to effectuate it.

## I. Background

In February 1987, Joseph C. Steffan was one of the most promising students at the United States Naval Academy ("Academy"). He had received consistently outstanding marks for his leadership and military performance. By his sophomore year, his instructors considered him "gifted," an "outstanding performer" who had "exhibited excellent leadership." He was praised as an "asset to the Academy." In his junior year, Mr. Steffan was selected as the Regimental Commander of one half of his class. His stellar evaluations continued: Mr. Steffan was a "model for his classmates and subordinates," whose "training [was] best characterized by his constant dedication to superior performance." None questioned that he would "undoubtedly make an outstanding naval officer." In his senior year, Mr. Steffan was selected as Battalion Commander, one of the ten highest ranking midshipmen at the Academy. In this capacity, Mr. Steffan had direct command over one-sixth of the Academy's 4,500 midshipmen.

In addition to his outstanding military performance, Mr. Steffan also excelled at extracurricular activities. In his senior year, he served as President and Cantor of the Catholic Choir and as premier soloist of the Glee Club. In his junior and senior years he sang the National Anthem as a soloist on national television at the Army–Navy game, for which he earned a Citation from the Superintendent of the Academy. It appeared that the sky was the limit for Mr. Steffan's career in the United States Navy.

But Joseph Steffan's promising military career was not to be realized. In February 1987, the Naval Intelligence Service ("NIS") received a report from the Academy alleging that Mr. Steffan had stated to another student that he was gay. The NIS commenced an investigation. When Mr. Steffan learned of the investigation, he asked an Academy Chaplain to intercede on his behalf with the Commandant of Midshipmen, Captain H.W. Habermeyer, in hopes that he would be allowed to graduate. The Chaplain was unable to convince Captain Habermeyer, who advised only that Mr. Steffan seek legal counsel. Several days later, Mr. Steffan himself

approached Captain Habermeyer to·request a meeting with the Superintendent. Captain Habermeyer asked him, "Are you willing to state at this time that you are a homosexual?" Mr. Steffan responded, "Yes, sir." He then asked Captain Habermeyer if he would be allowed to graduate. The Captain told him it was unlikely and asked him what he would do in that event. Mr. Steffan responded, "I guess I would have to leave the Naval Academy." Captain Habermeyer then informed Mr. Steffan that he would convene a Brigade Military Performance Board the next day and that he would arrange for a psychological evaluation.

At the Performance Board hearing, Mr. Steffan declined to present any evidence to show that he was not a homosexual. Captain Konetzni, the Deputy Commandant and presiding officer, stated that Mr. Steffan's performance at the Academy had been "outstanding." Captain Konetzni then asked Mr. Steffan, "I'd like your word, are you a homosexual?" Mr. Steffan responded, "Yes, sir." At that point, the hearing was terminated. After secret deliberations, the Board decided to change Mr. Steffan's military performance rating from an "A" to an "F", to suspend him from classes, and to recommend his discharge for "insufficient aptitude for commissioned service."

Based on this recommendation, an Academic Board was convened on April 1, 1987; after a hearing, it too recommended Mr. Steffan's discharge. Subsequently, Mr. Steffan met with the Conduct Officer, Major Funk, who advised him to resign. Major Funk noted that Mr. Steffan's discharge was a foregone conclusion and that it would necessitate a notation on the record of his homosexuality. Major Funk opined that Mr. Steffan's job prospects would suffer from such a notation. Mr. Steffan followed the Major's advice. On April 1, 1987, a mere six weeks before he was to graduate after nearly four years of exemplary performance, Mr. Steffan submitted his resignation from the Academy.

But on December 9, 1988, Mr. Steffan wrote to the Secretary of the Navy, asking that his resignation be withdrawn and that he be awarded his diploma. On February 9, 1989, based on the advice of the Superintendent·of the Naval Academy, the Secretary denied that request. The sole stated basis of this denial was Mr. Steffan's status as a homosexual, as revealed by his unrebutted admission before the Performance Board.

Mr. Steffan filed this action on December 29, 1988. He claims that the defendants, the Secretary of Defense, the Secretary of the Navy, the Superintendent of the Naval Academy, and the Academy's Commandant of Midshipmen (collectively, "Secretary"), denied him the equal protection of the laws when they forced him to resign solely because of his homosexual orientation. In the alternative, Mr. Steffan alleges that the Secretary both denied him equal protection and violated the Administrative Procedure Act when the Academy truncated his discharge proceedings. His case has reached this Court on two prior occasions. On the first occasion, we reversed the district court's order dismissing this case for discovery violations when Mr. Steffan refused to answer questions in deposition designed to elicit whether he had engaged in any homosexual conduct. *Steffan v. Cheney*, 920 F.2d 74 (D.C.Cir.1990). On the second occasion, in an unpublished opinion, we upheld the district judge's refusal to recuse himself for his prior references to gays and lesbians as "homos."

The district court entered summary judgment for the Secretary on December 9, 1991. In a lengthy opinion, the court explained, first, that the Academy's expedited procedures were not arbitrary and capricious, but were an "accommodation to an accomplished young man," who desired speedy resolution of his status. *Steffan v. Cheney*, 780 F.Supp. 1, 6 n. 11 (D.D.C.1991). Going on to evaluate the constitutionality of the military's gay ban, the court noted that Mr. Steffan was discharged because of his homosexual status, and not because of any homosexual conduct. *Id.* at 4–5. But it held that (1) homosexuals are not a suspect class, so regulations discriminating on the basis of homosexuality are subject only to rational-basis review, *id.* at 5–10; and (2) the military's gay ban bears a rational relation to the legitimate goals of "maintenance of discipline, morale, good or-

der, a respected system of rank and command, ... morality and respect for the privacy interests of both officers and the enlisted," *id.* at 16, and to the goal (not raised by the Secretary) of preventing the spread of AIDS in the armed forces. *Id.* at 13–16. Mr. Steffan appeals from the entry of summary judgment.

## II. Discussion

 Mr. Steffan argues that the Navy constructively discharged him in violation of the equal protection component of the Fifth Amendment's Due Process Clause. The equal protection component imposes the same restrictions upon the federal Government that the Fourteenth Amendment's Equal Protection Clause places upon the States. *Weinberger v. Weisenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975). Mr. Steffan challenges the regulations that were in effect when he resigned and when the Secretary of the Navy refused his request that he be allowed to graduate. The military's newly announced policy toward homosexuals in the armed forces was discussed at oral argument, but it is not at issue in this case. Both parties seem eager to have us resolve in advance the constitutionality of whatever guidelines the new regulations might ultimately prescribe. We decline their invitation. Mr. Steffan's appeal turns solely upon the legality of the regulations under which the military discharged him. Those regulations—and *only* those regulations—are properly before us in this case.

The regulations in effect at the relevant times were Department of Defense Directives 1332.14 and 1332.30, 32 C.F.R. Part 41, Appendix A ("DOD Directives" or "Directives"). They read, in part:

H. *Homosexuality*

 1. *Basis*

 a. Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The presence of such members ad-

versely affects the ability of the Military Services to maintain discipline, good order, and morale; to foster mutual trust among servicemembers; to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; to recruit and maintain members of the Military Services; to maintain the public acceptability of military service; and to prevent breaches of security.

 b. As used in this section:

 (1) Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts;

 . . . .

 (3) A homosexual act means bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires.

 c. The basis for separation may include preservice, prior service, or current service conduct or statements. A member shall be separated under this section if one or more of the following approved findings is made:

 (1) The member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are approved further findings that:

 (a) Such conduct is a departure from the member's usual and customary behavior;

 (b) Such conduct under all the circumstances is unlikely to recur;

 (c) Such conduct was not accomplished by use of force, coercion, or intimidation by the member during a period of military service;

 (d) Under the particular circumstances of the case, the member's continued presence in the Service is consistent with the interest of the Service in proper discipline, good order, and morale; and

(e) The member does not desire to engage in or intend to engage in homosexual acts.

(2) The member has stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual.

Mr. Steffan was forced to leave the Navy because of the last provision: he truthfully stated that he was a homosexual. Because of the Directives, Mr. Steffan no longer had a future in the United States Military Services, despite the Navy's prior opinion of him as one of its most promising midshipmen. Therefore, the district court held, and we agree, that Mr. Steffan's resignation, tendered after his superiors informed him of the consequences of refusing to resign, amounted to a "constructive discharge" under the DOD Directives. *Steffan v. Cheney,* 733 F.Supp. 115, 117–19 (D.D.C.1989). Mr. Steffan resigned because he knew, and his superiors told him, that under the Directives admitting one's homosexual orientation was cause for dismissal. The Secretary denied Mr. Steffan's request to withdraw his resignation for the same reason. Therefore, the constitutionality of the Directives is the central issue in this case.

The Secretary's brief relies heavily upon the concept of "military deference" to sustain its Directives. And not without reason—for it is surely true that we accord great independence to decisions of the military branches in their areas of expertise. For example, the Supreme Court (as well as this Court) upheld a military prohibition on servicemembers wearing yarmulkes, because of the military's professed need for uniformity of dress. *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986) ("traditional outfitting . . . encourages the subordination of personal preferences and identities in favor of the overall group mission."), *affirming Goldman v. Secretary of Defense,* 734 F.2d 1531 (D.C.Cir.1984). This regulation would likely have been struck down as violative of the First Amendment in another context, but the Court deferred to the military's judgment that it had a compelling secular interest in uniformity. A strong and independent military is essential to the national security, and courts should not lightly overturn military judgments as to the best means of ensuring that security.

But contrary to the Secretary's implication, a court need not close its eyes to the dictates of the Constitution whenever the military is involved—not even when it professes a national security interest in its conduct. There is no "military exception" to the Constitution. Indeed, even when the Supreme Court has deferred to a military judgment, it has been careful to do so only within the confines of ordinary constitutional analysis. *See, e.g., Rostker v. Goldberg,* 453 U.S. 57, 67, 101 S.Ct. 2646, 2653, 69 L.Ed.2d 478 (1981). This is particularly true for equal protection cases. When the military fails to accord individuals the equal protection of the laws, it treads upon an area of expertise that has long been conceded to the courts. In deciding such cases, therefore, courts should not stray from the boundaries of ordinary equal protection review. For example, faced with a claim that the military discriminates against African–Americans or women, the court should not fail to apply strict or intermediate scrutiny to the military's action. *See Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Although the concept of military deference should lead a court to grant the benefit of the doubt to the Government's opinion that a "compelling" or "important" military interest exists (at least where there is a colorable claim of such an interest), the court should not hesitate to review the case with its customary thoroughness.

In this case, however, we decline to rule on whether a "compelling" or "important" state interest is necessary. This would depend, of course, on whether homosexuals, defined by their sexual orientation, are a "suspect" or "quasi-suspect" class accorded "heightened scrutiny" under equal protection review. This Court has only had occasion to rule on the suspect status of homosexuals as defined by homosexual *conduct. Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987); *Dronenburg v. Zech,* 741 F.2d 1388 (D.C.Cir.1984). In that context, we have noted the anomaly of according special protection to a class whose defining characteristic, homosexual conduct,

can be made illegal. *Padula*, 822 F.2d at 103 (citing *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)). This is a different case: the class at issue is defined by homosexual *orientation*, not conduct. The Secretary does not allege that Mr. Steffan ever engaged in homosexual conduct. Accordingly, the district court acknowledged that Mr. Steffan was discharged solely because of his status as a homosexual. *Steffan v. Cheney*, 780 F.Supp 1, 5 (D.D.C.1991) ("[T]his is primarily a case about the plaintiff's status as a homosexual."). As we have previously noted, "whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation*" remains an open question in this Circuit. *Doe v. Casey*, 796 F.2d 1508, 1522 (D.C.Cir.1986), *aff'd in part and rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (emphasis in original). It is that open question that we must begin to answer today in deciding the constitutionality of the military regulations applied to Mr. Steffan.

Nevertheless, we will leave unaddressed one important aspect of that question. We find it unnecessary to inquire whether homosexuals, as defined solely by orientation, comprise a "suspect" or "quasi-suspect" class. We need not decide, because we find that even if homosexuals are not accorded suspect status, the DOD Directives cannot survive constitutional scrutiny.

### A. *Rationality Review*

 Any governmental action that burdens individuals unequally but does not burden a "suspect class" need only survive "rationality," or "rational-basis" review. Rationality review requires that the action be "rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985). This is not an exacting standard. Nor should it be: Every governmental action burdens some individuals more than others. Thus, a strict standard of review invalidating a large percentage of regulations based only on their differential impact or purpose would handcuff government in the name of equality.

The Constitution neither requires nor permits courts to reach for a constitutional blunderbuss to resolve every equal protection challenge. Absent a burden upon a suspect class, the court's role is merely to ensure: (1) that the government has a legitimate purpose for distinguishing among the individuals affected; and (2) that the means chosen to effect that purpose bear some reasonable relation to it, and thus are not wholly arbitrary. *See, e.g., Zobel v. Williams*, 457 U.S. 55, 61–64, 102 S.Ct. 2309, 2313–15, 72 L.Ed.2d 672 (1982). The government is under no obligation to justify its behavior; instead, before striking down a statute or regulation on rationality review the court must evaluate and find wanting any potentially legitimate grounds upon which to uphold the government's action. *Heller v. Doe*, —— U.S. ——, —— – ——, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993).

 Although the court has a limited role under rationality review, that role remains significant as a bulwark against unreasonable and illegitimate restrictions. When individuals are deprived of the equal protection of the laws by a governmental actor for entirely arbitrary reasons, or for reasons that rest solely upon irrational and invidious prejudices against a class of people (whether or not a "suspect class"), a court should declare the government action unconstitutional even under rational-basis review. *Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259–60. Otherwise, rationality review would be tantamount to no review at all—a result manifestly inconsistent with Supreme Court precedent. *See, e.g., Zobel*, 457 U.S. at 61–64, 102 S.Ct. at 2313–15; *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 533–38, 93 S.Ct. 2821, 2825–28, 37 L.Ed.2d 782 (1973).

With these principles in mind, we must decide whether Mr. Steffan's unequal treatment was rationally related to a legitimate military purpose. We will begin by addressing the purposes articulated in the Secretary's brief. We will then proceed to discuss other possible rationales for excluding homosexuals from military service.

### B. *Propensity to Engage in Illegal Conduct*

According to the Secretary's attorney, the primary purpose of the regulations is to exclude from the military those individuals who have a propensity to engage in unlawful conduct. The Directives define "homosexual" as "a person ... who engages in, desires to engage in, or intends to engage in homosexual acts." DOD Directives § H.1.b(1). Those "homosexual acts" are forbidden to military servicemembers, and there is no dispute that laws forbidding such conduct are constitutional. By excluding those who "engage[ ] in, desire[ ] to engage in, or intend[ ] to engage in homosexual acts," the military claims it is excluding those with a "propensity" to engage in forbidden conduct, and it is that conduct—and not merely a person's orientation—that has a deleterious effect upon the morale of the armed forces. Accordingly, when a servicemember "has stated that he or she is a homosexual," he is admitting that he "engages in, desires to engage in, or intends to engage in" acts that are harmful to morale, and he will be dismissed from the military, "unless there is a further finding that the member is not a homosexual"—that is, unless the member's statement turns out to be false. DOD Directives § H.1.c(2).

In this case, Mr. Steffan stated that he was a homosexual and thereafter resigned under pressure because he was led to understand that his mere homosexual orientation was sufficient to compel dismissal. His superiors never asserted that Mr. Steffan had engaged in homosexual conduct, and he never admitted to any. On its face, therefore, his discharge seems unrelated to any conduct—his statement revealed nothing more than a sexual orientation. But the Secretary argues that even if Mr. Steffan had a "homosexual orientation" he could have rebutted the presumption that he was a "homosexual" by showing that he did not "engage[ ] in, desire[ ] to engage in, or intend[ ] to engage in homosexual acts." To explain how this might be, counsel for the Secretary attempted at oral argument to draw a distinction between "attraction" and "desire." A person might be attracted to members of the same sex, and thus have a "homosexual orientation," yet that person might not "desire" to engage

in homosexual conduct. Counsel for the Secretary described individuals fitting this description as "celibate homosexuals." Oral argument was the first time this Court became aware of the "celibate homosexual" exception. Evidently, we are not alone: to the Secretary's knowledge, no servicemember seeking to remain in the military has ever invoked this purported defense. No reference to "celibate homosexuals," or to any supposed distinction between "attraction" and "desire," can be found in the Directives. Therefore, Mr. Steffan could hardly be expected to divine the existence of this "exception" either from the language of the Directives or from past practice. Nonetheless, we will concede for the purpose of argument that it is (at least semantically) possible that a person with a homosexual orientation might not be a "homosexual" under the Directives because that person lacked a "desire" to engage in prohibited conduct.

The Secretary's argument was designed to prove that the Directives are aimed entirely at rooting out homosexual conduct and not persons of homosexual orientation. Evidently, the Navy believes that the difference between "attraction" and "desire" determines whether a servicemember has a propensity to engage in misconduct, and it is only this misconduct, and not the mere presence of persons of homosexual orientation, that the Navy fears. The disingenuousness of this argument is plain from the face of the Directives. Even accepting the existence of the "celibate homosexual" defense, the Directives as a whole are far more concerned with status—with thoughts and desires—than with conduct. And, as we will discuss in detail below, a presumption of misconduct based solely on status is insupportable even under rationality review.

### 1. *The plain meaning of the Directives.*

From the face of the DOD Directives, it is plain that they primarily target homosexual *status*, and not homosexual *conduct*. Mr. Steffan was forced to resign under section H.1.c(2), which mandates dismissal of any servicemember who states that he or she is a homosexual unless there is a further finding that the servicemember is not, in fact, a

homosexual. Section H.1.b(1) defines "homosexual" as someone "who engages in, desires to engage in, or intends to engage in homosexual acts." DOD Directives § H.1.b(1).

Although this definition ultimately relies upon some connection to homosexual conduct, the primary focus of the Directives is not, in fact, the conduct itself, but the "desire" to engage in that conduct. This becomes clear when one compares section H.1.c(2), under which Mr. Steffan was discharged, with section H.1.c(1). Under c(1), a servicemember who actually *engages* in homosexual acts can escape discharge if he can show that "such conduct is a departure from the member's usual and customary behavior"; that it is unlikely to recur; that it was not coercive; that it will not harm the morale of the armed forces; and (most significantly) that "[t]he member does not desire to engage in or intend to engage in homosexual acts." DOD Directives § H.1.c(1). For all intents and purposes, the servicemember must prove that he is not a "homosexual," as defined in section H.1.b(1), except that he happened to engage in homosexual conduct. If his thoughts are in accord with his conduct (if he "desires" to engage in homosexual acts), then he cannot escape dismissal.

As an example, imagine that two servicemembers engage in homosexual conduct. One is homosexual by orientation—that is, he "desires" to engage in homosexual acts. The other is heterosexual—that is, although he did engage in a homosexual act on this occasion, it was a departure from his usual practice and he does not "desire" to engage in any more such acts. Both servicemembers admit their conduct to their superiors; both truthfully represent their sexual orientations. Under section c(2), the homosexual servicemember will be discharged—period. But under c(1), the heterosexual servicemember stands a good chance of remaining in the military.

As this example illustrates, both c(1) and c(2) are aimed at the same thing: homosexual orientation. Whether the servicemember has engaged in homosexual conduct or has stated that he is a homosexual, he can escape dismissal by showing that he is a heterosexual. But he can never escape dismissal, once

he truthfully admits his orientation or his conduct, if he "desires" to engage in homosexual acts. The Directives thus attack status, not conduct; and the status they are after is defined only by one's thoughts.

### 2. *Status predicting conduct.*

The Secretary's asserted rationale for the Directives can thus be stated as follows: a person who, by his own admission, "desires" to engage in homosexual conduct has a "propensity" to engage in repeated homosexual conduct (one assumes "repeated" conduct is the concern, because a single incidence does not automatically require dismissal under c(1)), and that person must be dismissed from the military as a prophylactic measure. As a factual matter, such a proposition—that a person who "desires" to engage in misconduct will do so—is hardly self-evident. Many of us "desire" in the abstract to do things and yet refrain from doing them simply because they are against the rules. Nonetheless, under rationality review, the Secretary need not show a perfect means-ends fit, but only a reasonable relation between the means (excluding persons of homosexual orientation) and the end (preventing homosexual conduct). *Heller*, —— U.S. at ——, 113 S.Ct. at 2643.

But there is no such rational relation here. Homosexual conduct is more than a practice discouraged by the military: it is grounds for discipline and sometimes (in the case of sodomy) a criminal act. Therefore, the Secretary's justification for the gay ban presumes that a certain class of persons will break the law or the rules solely because of their thoughts and desires. This is inherently unreasonable. In a recent entrapment case the Supreme Court held that even a defendant's prior *conduct* did not demonstrate a propensity to engage in the exact same actions when they were later made illegal. "Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even when they disapprove of it." *Jacobson v. United States*, —— U.S. ——, ——, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992).

A conclusion as to future conduct is even less justifiable when based, not on past conduct, but on mere thoughts and desires. "[A] person's inclinations and 'fantasies ... are his own and beyond the reach of government....'" *Id.* (quoting *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67, 93 S.Ct. 2628, 2640–41, 37 L.Ed.2d 446 (1973)). "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969) (government may not forbid private ownership of obscene materials in one's own home). By firing Mr. Steffan purely for his "inclinations and fantasies," the Secretary seeks to exercise this very power over the minds of those in the military.

The "constitutional heritage" to which Justice Marshall referred in *Stanley* is evident in the evolution of the law of treason. Under a statute of Edward III, it was a crime to "compass or imagine the Death of ... the King." Statute of Treasons, 25 Edw. III. This became the crime of "constructive treason," which was enforced against supposed "compassers" and "imaginers" even in the absence of any overt act (other then mere words) or any conspiracy to carry out the regicide. *See, e.g., Case of Thomas Burdet,* 79 Eng.Rep. 706 (1477); *Trial of Sir John Perrot,* 1 How.St.Tr. 1315, 1318 (1592); *Trial of Thomas Hardy,* 24 How.St.Tr. 199, 894 (1794) (all cited in *Watts v. United States,* 394 U.S. 705, 709–10 & n. 1, 89 S.Ct. 1399, 1402–03 & n. 1, 22 L.Ed.2d 664 (1969) (Douglas, J., concurring)). *See generally Cramer v. United States,* 325 U.S. 1, 8–22, 65 S.Ct. 918, 921–29, 89 L.Ed. 1441 (1945) (discussing the law of treason in England and America prior to the Constitutional Convention). Our Constitution expressly repudiates constructive treason. Article III, section 3 declares: "treason against the United States shall consist *only* in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No person shall be convicted of Treason unless on the Testimony of two Witnesses to the same *overt Act,* or on Confession in open Court." U.S. Const. art. III, § 3 (emphasis added). These restrictions, limiting the definition of treason to certain discrete types of conduct and requiring an "overt act" for conviction, express the constitutional principle that a person's thoughts are his own—however distasteful they may be to the state.

These considerations were present even in the cases that upheld the Smith Act's broad proscriptions of subversive activities. Despite the nation's fear of a supposed communist threat to overthrow the state, the Supreme Court never went so far as to allow individuals to be prosecuted merely for private communist sympathies. For example, in *Scales v. United States,* 367 U.S. 203, 221–24, 81 S.Ct. 1469, 1482–84, 6 L.Ed.2d 782 (1961), the Court accepted as reasonable a construction of the Smith Act's "membership clause" that required for conviction proof of "active" membership in a communist-affiliated organization and a "specific intent" to overthrow the Government of the United States. Only with these limits did the Court uphold this provision, and it noted that a broader construction would render the statute's constitutionality doubtful. *Scales,* 367 U.S. at 222, 224, 81 S.Ct. at 1482–83, 1483–84; *Yates v. United States,* 354 U.S. 298, 318–20, 77 S.Ct. 1064, 1076–78, 1 L.Ed.2d 1356 (1957). Under the Court's approved construction, a connection existed between membership in the organization and an overt act of conspiracy that sufficed to bring the statute "within established, and therefore presumably constitutional, standards of criminal imputability." *Scales,* 367 U.S. at 228, 81 S.Ct. at 1485. Similarly, in *Dennis v. United States,* 341 U.S. 494, 499–502, 71 S.Ct. 857, 862–63, 95 L.Ed. 1137 (1951), the Court construed the subversive advocacy provisions of the Act as requiring both a specific conspiratorial intent to overthrow the Government of the United States at some future date, and active advocacy of (as opposed to a mere statement of support for) that position. Later, as the nation's fear of domestic communism waned, the Supreme Court reasserted its view that mere status—mere membership in a "subversive organization"—could not be sufficient grounds for a deprivation of rights, when the Court held unconstitutional a law that indiscriminately deprived Communist Party members of their passports. *Aptheker v. Secretary of State,*

378 U.S. 500, 509–11, 84 S.Ct. 1659, 1665–67, 12 L.Ed.2d 992 (1964). Thus, although the subversive activity cases are not beloved of civil libertarians, even these cases manifestly stop short of allowing the kind of presumption that the Secretary claims in this case: a presumption of misconduct from mere status, in the absence of evil intent.

In the present case, of course, Mr. Steffan has not been convicted of treason, nor subversive advocacy, nor any other crime. But he has been denied something that equally qualified and less qualified individuals have enjoyed: the privilege of serving and defending his country in the armed forces. In cases analogous to those under the Smith Act, the Supreme Court has consistently held that government may not deny a job to an individual solely because of his status as a member of a "subversive organization," absent any specific intent to further unlawful action. *Elfbrandt v. Russell*, 384 U.S. 11, 17–19, 86 S.Ct. 1238, 1241–42, 16 L.Ed.2d 321 (1966); *Wieman v. Updegraff*, 344 U.S. 183, 190–91, 73 S.Ct. 215, 218–19, 97 L.Ed. 216 (1952). *See also Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (government cannot fire non-policymaking employee solely because of political affiliation); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (same); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (prohibition against discrimination based on political affiliation extends to employment decisions other than firing). Despite these warnings, the Secretary has accorded Mr. Steffan differential treatment solely because of the content of his thoughts, as revealed by his truthful statement that he is a homosexual. We think this is repugnant to the various common law and constitutional principles that guard the sanctity of a person's thoughts against government control, as expressed in the cases discussed above. A person's status alone, whether determined by his thoughts or by his membership in a certain group, is an inadequate basis upon which to impute misconduct. Accordingly, we find that the Secretary's "propensity" argument, which presumes that "desire" will lead to misconduct, is illegitimate as a matter of law.

It cannot provide a rational basis for the DOD Directives.

### C. *Effect on Morale, Discipline, and Recruitment of Heterosexuals*

The Secretary's argument that the Directives protect morale and discipline in the armed forces and aid recruitment of new soldiers goes beyond preventing homosexual conduct. The Secretary apparently also fears the impact that the mere presence of persons of homosexual orientation will have on these vital military interests. The Directives state, in part:

> The *presence* in the military environment of persons who ... by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The *presence* of such members adversely affects the ability of the Military Services to maintain discipline, good order, and morale; ... [and] to recruit and retain members of the Military Services....

DOD Directives § H.1.a (emphasis added) (see *supra* page 61 for the full text of § H.1.a). The Secretary does not claim that homosexual servicemembers themselves will have poor morale or discipline, nor does he assert that they will intentionally sabotage the interests of the military. Instead, as the district court observed, the Secretary fears that these grievous consequences will arise because heterosexual soldiers will be appalled at the requirement that they serve alongside homosexuals. *Steffan v. Cheney*, 780 F.Supp. 1, 12–13 (D.D.C.1991).

Under rationality review, the court must presume that the Secretary's fears are well-founded, even though we may have a higher opinion of the maturity of members of the armed forces than do their policymakers. But these fears are patently insufficient to justify a discriminatory policy, even under rationality review, because each depends solely upon the prejudice of third parties. Because third parties do not like homosexuals, the argument runs, they will not wish to serve alongside them. Forcing them to serve with homosexuals will lower their morale, impair their discipline, and discourage them from enlisting. Similar objections were

68

voiced by opponents of President Truman's 1948 executive order requiring racial integration of the armed forces. *See Dahl v. Secretary of United States Navy,* 830 F.Supp. 1319 (E.D.Cal.1993) (quoting Defense Personnel Security Research and Education Center, *Nonconforming Sexual Orientations and Military Suitability* at 8–10 (1988)). But a cardinal principle of equal protection law holds that the government cannot discriminate against a certain class in order to give effect to the prejudice of others. Even if the government does not itself act out of prejudice, it cannot discriminate in an effort to avoid the effects of others' prejudice. Such discrimination plays directly into the hands of the bigots; it ratifies and encourages their prejudice.

In *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), the Court overturned a state court's child custody order, which took the child away from her mother and delivered custody to the child's father solely because the mother had remarried to an African–American. The state court had not acted out of prejudice, but stated that its order was in the best interest of the child because of society's prejudice. Although the mother and father were equally fit parents, the state court reasoned that the child would be subject to discrimination in her community if she lived with parents of mixed races. The Supreme Court reversed. In a unanimous opinion, it held that even if the child's welfare would indeed be impaired by living with parents of mixed races, the court could not determine custody on that basis because such a decision would merely give effect to the prejudice of others—a result that the Constitution does not allow. "The Constitution cannot control such prejudices but neither can it tolerate them," the Court held. *Palmore,* 466 U.S. at 433, 104 S.Ct. at 1882.

Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial

prejudice that they assume to be both widely and deeply held.'
*Id.*

Although *Palmore* involved a "suspect class" and was decided under strict scrutiny, the Court extended its reasoning to rational-basis review in *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *Cleburne,* the city had denied a zoning permit to construct a home for the mentally disabled in a residential neighborhood. One of the city's arguments for rejecting the permit was that neighborhood residents, angered by the presence of the home, would pose a danger to the mentally disabled residents. The Court (citing *Palmore*) rejected this argument as giving effect to irrational private biases, and held that it could not provide a rational basis for denying the permit. *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3258–59.

The *Palmore/Cleburne* principle has a parallel in First Amendment law: the "heckler's veto." The First Amendment forbids the government to silence speech based on the reaction of a hostile audience, unless there is a "clear and present danger" of grave and imminent harm. *See, e.g., Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). Otherwise, a vocal minority (or even majority) could prevent the expression of disfavored viewpoints—a result contrary to the central purpose of the First Amendment's guarantee of free expression. *See Christian Knights of the KKK v. District of Columbia,* 919 F.2d 148, 150, 152–53 (D.C.Cir.1990) (Edwards, J., concurring; Wald, J., dissenting); *NAACP Legal Defense & Educ. Fund, Inc. v. Devine,* 727 F.2d 1247, 1261–62 (D.C.Cir.1984), *rev'd on other grounds sub nom. Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Americans United for Separation of Church & State v. City of Grand Rapids,* 980 F.2d 1538, 1553 (6th Cir.1992); Harry Kalven, Jr., The Negro and the First Amendment 140–160 (1965).

These constitutional principles mandate that government may not disadvantage a person on the basis of his status or his views solely for fear that others may be offended or

angered by them. That is precisely the substance of the Secretary's argument in this case: that heterosexual service-members and potential recruits will be offended by the presence of homosexuals, and this will affect their morale, discipline, and enlistment. The Constitution does not allow government to subordinate a class of persons simply because others do not like them.

### D. *Privacy*

The Secretary also argues, and the Directives state, that the presence of homosexuals in the military will invade the privacy of heterosexual servicemen. DOD Directives § H.1.a (presence of homosexuals impairs military's ability "to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy").

This argument can mean one of two things: either (1) that homosexual servicemembers will ogle and stare at their heterosexual counterparts in the shower or other close quarters; or (2) that heterosexuals will fear such staring and feel an invasion of privacy. The argument that homosexuals will stare is very similar to the argument that they will engage in homosexual acts. Again, it equates thoughts and desires with propensity to engage in misconduct. The argument that heterosexuals will fear such staring is, in turn, a version of the argument that government should be allowed to give effect to the irrational fears and stereotypes of third parties. That argument is foreclosed by *Palmore* and *Cleburne.*

Moreover, even the Secretary's own interpretation of the Directives casts doubt upon the seriousness of his privacy rationale. Recall that counsel for the Secretary maintains that the Directives permit "celibate homosexuals," who are *attracted* to members of the same sex but do not *"desire"* homosexual conduct, to serve in the military. See *supra* page 64. So, if the Navy is not concerned about heterosexual servicemembers perceiving an invasion of privacy from the presence of a "celibate homosexual," then the marginal increase in invasiveness from a homosexual who "lusts in his heart" but does not intend conduct should be minimal. Thus, even if the privacy rationale were legitimate in the abstract, these Directives plainly do not protect privacy.

### E. *Rationales Not Offered by the Secretary*

Under the *Heller* formulation of rationality review, we must also evaluate arguments that the Secretary does not himself proffer, if they may present a rational basis for the Directives. *Heller,* —— U.S. at —— – ——, 113 S.Ct. at 2642–43. The district court relied on one such rationale: preventing the spread of AIDS in the armed forces. We do not agree that this could be a rational basis for the Directives. Homosexual *orientation* cannot spread the AIDS virus. Homosexual, or heterosexual, *conduct* can—and then only if one of the participants carries the virus. Even if AIDS happens to be more prevalent today among homosexuals than among heterosexuals, justifying the Directives on this basis requires the illegitimate assumption that persons of homosexual orientation will break the rules by engaging in homosexual conduct as members of the armed forces.

Finally, another rationale on which the Secretary does not rely in his brief, but to which the Directives allude, is homosexuals' alleged susceptibility to blackmail. DOD Directives § H.1.a (presence of homosexuals impairs military's ability "to prevent breaches of security"). But as Judge Norris has aptly pointed out, the military's policy only *increases* the risk of blackmail by making gays and lesbians remain in the closet for fear of forfeiting their careers. *Watkins v. United States Army,* 875 F.2d 699, 730–31 (9th Cir.1989) (Norris, J., concurring), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); *see also Dahl v. Secretary of United States Navy,* 830 F.Supp. 1319, 1332 (E.D.Cal.1993) ("the only possible threat homosexuals could pose to military security (i.e., that undeclared homosexuals might be 'discovered' and blackmailed) could be obviated by the very policy that the threat allegedly justifies...."). The gay ban raises the stakes of silence enormously, and gives potential blackmailers leverage they would not otherwise have. If there is a risk to military security from homosexuality, then, the Directives themselves are to blame for it.

**70**

### III. Conclusion

The DOD Directives, the military regulations in effect when the Navy compelled Joseph Steffan to resign solely because he admitted his homosexual orientation, are not rationally related to any legitimate goal. Instead, it is apparent that the Directives exclude a particular class of individuals, identifiable only by their thoughts and desires, for no other reason than the military's fear and dislike of that group. The constitutional requirement of equal protection forbids the government to disadvantage a class based solely upon irrational prejudice, whatever the standard of review. *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446–50, 105 S.Ct. 3249, 3257–60, 87 L.Ed.2d 313 (1985). We find that the Directives violate the equal protection component of the Fifth Amendment's Due Process Clause. We need not and do not reach the appellant's alternative contentions relating to the procedures used to effect his discharge.

America's hallmark has been to judge people by what they do, and not by who they are. Just as Mr. Steffan won his Battalion Commander ranking by his conduct, so must he be judged by his conduct. It is fundamentally unjust to abort a most promising military career solely because of a truthful confession of a sexual preference different from that of the majority, a preference untarnished by even a scintilla of misconduct. We reverse the decision of the district court. The appellees shall grant Mr. Steffan his diploma from the United States Naval Academy, reinstate him to military service, and commission him as an officer.

*It is so ordered.*

Before: MIKVA, Chief Judge; WALD, HARRY T. EDWARDS, SILBERMAN, BUCKLEY, STEPHEN F. WILLIAMS, GINSBURG, SENTELLE, KAREN LeCRAFT HENDERSON, and RANDOLPH, Circuit Judges.

### ORDER

#### Jan. 7, 1994.

This matter is presently before the Court upon appellees' suggestion for rehearing *in banc* of the remedy ordered in the panel opinion. In addition, a judge of the court has *sua sponte* requested the taking of a vote on the question of also placing the merits of the case before the *in banc* court.

The court has been polled and a majority of the judges in regular active service have voted in favor of the entire case being reheard by the court sitting *in banc*. Accordingly, it is

ORDERED, by the Court, *in banc*, that the judgment filed herein on November 16, 1993, be, and the same hereby is, vacated.

A future order will govern further proceedings.