34 F.3d 1469
 65 Fair Empl.Prac.Cas. (BNA) 1132,
65 Empl. Prac. Dec. P 43,198, 63 USLW 2150
 Volker Keith MEINHOLD, Plaintiff-Appellee,
v.
UNITED STATES DEPARTMENT OF DEFENSE; United States
Department of the Navy, Defendants-Appellants.
Volker Keith MEINHOLD, Plaintiff-Appellee,
v.
UNITED STATES DEPARTMENT OF DEFENSE; United States
Department of the Navy, Defendants-Appellants.
 Nos. 93-55242, 93-56354.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 16, 1993.
Decided Aug. 31, 1994.
 
 Mark I. Levy (argued) and E. Roy Hawkens (on the briefs), U.S. Dept. of Justice, Washington, DC, for defendants-appellants.
 John I. McGuire, Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, CA, for plaintiff-appellee.
 Victor J. Wolski, Pacific Legal Foundation, Sacramento, CA, amicus curiae for Pacific Legal Foundation, et al.
 Ruth E. Harlow, American Civil Liberties Union, New York City, amicus curiae for American Civil Liberties Union.
 Appeals from the United States District Court for the Central District of California.
 Before: SKOPIL, THOMPSON, and RYMER, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 These consolidated appeals present a number of questions arising out of the Navy's discharge of Petty Officer Volker Keith Meinhold on account of his statement on ABC World News Tonight, "Yes, I am in fact gay."
 
 
 2
 Finding that the Navy's policy was to ban gays and lesbians based on status, not on conduct, and that such a policy violates the Equal Protection Clause of the Fifth Amendment, the district court granted Meinhold's motion for summary judgment and enjoined the Department of Defense (DOD) from discharging or denying enlistment based on sexual orientation.[1] It also restrained DOD from maintaining files having to do with the sexual orientation of any member of the armed forces in the absence of conduct affecting the military mission. The court did not rule on Meinhold's estoppel claim, and it declined to require exhaustion of administrative remedies despite Meinhold's failure to appeal to the Board for Correction of Naval Records (BCNR) as it found that the government had conceded that a new hearing would result in the same decision.
 
 
 3
 Meinhold's nonconstitutional claim should have been resolved before his equal protection claim was reached. Nevertheless, because the record on summary judgment was fully developed and we can decide whether it suffices to estop the Navy as a matter of law, we have reviewed it independently and conclude that the Navy engaged in no affirmative misconduct and so cannot be estopped to order Meinhold separated on the ground of his homosexuality. Since the Navy's position leaves no room for supposing that its regulations could be differently interpreted by the BCNR, we agree that further review would be futile.
 
 
 4
 On the merits, we defer to the Navy's judgment that the presence of persons who engage in homosexual conduct, or who demonstrate a propensity to engage in homosexual conduct by their statements, impairs the accomplishment of the military mission. However, DOD regulations[2] do not have to be applied as the Navy did in this case, to require separation based only on Meinhold's statement that he is gay. Rather, the regulations can be read to reach a statement of homosexuality only when the statement itself manifests a concrete, expressed desire or intent to engage in homosexual acts. Construing the regulations in this way is consistent with the military judgment that homosexual conduct is incompatible with military service, and with our obligation to construe regulations so as to avoid constitutionally problematic results. Accordingly, we hold that the regulations then in effect, reasonably and constitutionally construed, could not be applied so as to discharge Meinhold solely because of a statement of orientation devoid of any concrete, expressed desire or intent to act on his homosexual propensity contrary to military policy. Therefore, to the extent the district court's judgment enjoins the Navy from discharging Meinhold based solely on his statement of status, we affirm; beyond that, we do not agree that injunctive relief may properly extend past the Navy's treatment of Meinhold to the Department of Defense's treatment of all members of the armed services. To that extent, the judgment is overbroad and we reverse.I
 
 
 5
 Meinhold had served for twelve years as an enlisted member of the United States Navy. On May 19, 1992, he acknowledged on television that he was gay. The next day the United States Navy initiated discharge proceedings pursuant to Naval Military Personnel Manual 3630400(1).[3]
 
 
 6
 At the hearing, both the Navy Recorder and the Legal Advisor to the administrative discharge board took the position that the board must recommend discharge if it found that Meinhold is homosexual, and that a member of the service is homosexual if he says he is whether or not he has engaged in homosexual conduct. The board so found, due to Meinhold's televised statement. As a result, Meinhold was given an honorable discharge on August 12, 1992.
 
 
 7
 Meinhold brought this action for a declaration that the Department of Defense's then-existing policy regarding homosexuals was unconstitutional, and sought reinstatement in the Navy on the ground that his discharge was procedurally defective, the Navy was estopped from separating him on the basis of status, and the relevant regulations were constitutionally infirm. In ruling on cross-motions for summary judgment, the district court held that further proceedings to exhaust administrative remedies would be futile as it was undisputed that a new hearing would result in the same decision. The court then held that gays and lesbians should not be banned from serving in the military in the absence of conduct which interferes with the military mission. It therefore rescinded Meinhold's discharge and permanently enjoined the Department of Defense "from discharging or denying enlistment to any person based on sexual orientation in the absence of sexual conduct which interferes with the military mission of the armed forces of the United States." Meinhold, 808 F.Supp. at 1458.
 
 
 8
 DOD timely appealed and sought an emergency stay of the district court's injunction to the extent it conferred relief on persons other than Meinhold. After this relief was denied, President Clinton announced a new policy regarding homosexuals in the military, popularly identified as the "don't ask/don't tell" policy. DOD again applied for an emergency stay, this time on the ground that the injunction barred it from implementing the new policy. Meanwhile, Meinhold also asked the district court to hold DOD in contempt based on the Department's announced intention to transfer two servicemembers who had admitted their homosexuality to the standby reserves. Although the court made no finding of contempt, it did amend the previous injunction to restrain DOD from creating or maintaining files based on sexual orientation and from taking any actions against gay or lesbian servicemembers based on their sexual orientation. DOD appealed this order and sought an emergency reconsideration of this court's denial of a stay pending appeal. We declined to reconsider our earlier rulings, but on October 29, 1993, the Supreme Court, --- U.S. ----, 114 S.Ct. 374, 126 L.Ed.2d 324, granted a stay of the injunction, as amended, to the extent it conferred relief on persons other than Meinhold.
 
 II
 
 9
 We first consider whether the district court's decision and order should be vacated for either of the preliminary reasons urged by the Navy: that the court erred in adjudicating Meinhold's constitutional claim before requiring him to exhaust intramilitary remedies, and that it erred in failing to resolve the nonconstitutional claims that Meinhold contends require his reinstatement before holding the policy unconstitutional.
 
 
 10
 * DOD argues that the exhaustion doctrine applies with particular force in cases where a discharged servicemember seeks reinstatement because separation of powers concerns and military discipline considerations are implicated. It also contends that exhaustion promotes judicial economy by producing a record for judicial review, affording the relief sought, and possibly mooting issues. We agree that strict application of exhaustion requirements in military discharge cases helps maintain the balance between military authority and federal court intervention, but exhaustion is not required where an administrative appeal would be futile. See Watkins v. United States Army, 875 F.2d 699, 705 (9th Cir.1989) (en banc), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).
 
 
 11
 DOD suggests that instead of finding that it had conceded futility, the district court should have found that exhaustion was required based on Meinhold's "concession" that constitutional arguments need not be reached because his nonconstitutional arguments mandate reinstatement. It also suggests that further review could have made a difference as the parties differed over the regulatory definition of "homosexual": Meinhold took the view the regulations mandate discharge based solely on status, whereas in the Navy's view the regulations apply to those who either have engaged in past homosexual acts or who by their statements indicate a propensity to engage in future homosexual acts. Meinhold, on the other hand, contends that exhaustion has to be futile since there are no exceptions to DOD's policy that if a servicemember states that he is homosexual, discharge is mandatory unless he can prove that he is not a homosexual.
 
 
 12
 We have difficulty with the Navy's argument because it doesn't square with the official position taken in Meinhold's discharge proceeding. There, the Navy Recorder argued, and the Legal Advisor to the administrative discharge board advised, that the board had to recommend separation if it found Meinhold is homosexual and that a servicemember is a homosexual if he makes a statement that he is. The Navy points to nothing in the record which suggests that a disposition by the BCNR could have differed. We therefore cannot say the district court erred in concluding that futility was undisputed.
 
 B
 
 13
 In Watkins, we held that equitable estoppel may be applied against the military and should be considered as a basis for relief before constitutional claims are reached. The Navy submits that Watkins controls and required the district court to resolve Meinhold's equitable estoppel claim prior to reaching his equal protection issue. Meinhold responds that the government raised a triable issue of fact which precluded summary judgment on the estoppel claim. For that reason, he argues, reaching the constitutional issue was not unnecessary.
 
 
 14
 It is clear that the nonconstitutional claims should have been decided first. New York City Transit Auth. v. Beazer, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); cf. Watkins, 875 F.2d at 705. As the Supreme Court instructed in Jean v. Nelson, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985):
 
 
 15
 Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision. This is a fundamental rule of judicial restraint.... [I]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.
 
 
 16
 Id. at 854, 105 S.Ct. at 2997 (citations and quotation marks omitted). We are not persuaded by Meinhold's argument that there should be an exception simply because the constitutional claim could be resolved summarily whereas the nonconstitutional claim could not be. See Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105-06, 65 S.Ct. 152, 154-55, 89 L.Ed. 101 (1944). In any event, the district court gave no such reason, but simply passed over the nonconstitutional claim. It was error to do so.
 
 
 17
 In these circumstances, we can either remand for the district court to consider the equitable estoppel claim, or dispose of it ourselves if it is possible to do so as a matter of law. United States v. Locke, 471 U.S. 84, 92 n. 9, 105 S.Ct. 1785, 1791 n. 19, 85 L.Ed.2d 64 (1985). In this case, it appears to us that further factfinding is unnecessary and we can determine as easily as the district court whether Meinhold's evidence, viewed most favorably to him, shows the Navy's prior knowledge of homosexuality and affirmative misconduct. As a matter of law, it does not.
 
 
 18
 Under Watkins, "a court must find affirmative misconduct by the government and must also find that the government's conduct will cause a serious injustice and that estoppel will not cause undue harm to the public interest." Watkins, 875 F.2d at 706. "Affirmative misconduct" is conduct "going beyond mere negligence." Id. at 707 (quotation marks omitted). While "[t]here is no single test for detecting the presence of affirmative misconduct[, and] each case must be decided on its own particular facts and circumstances[, a]ffirmative misconduct does require an affirmative misrepresentation or affirmative concealment of a material fact by the government." Id. (citation omitted).
 
 
 19
 Viewing the record in Meinhold's favor and indulging the inferences he urges, the evidence shows that the Navy never asked about his status, although it did ask whether he had ever engaged in homosexual activity, which he truthfully denied; Navy personnel knew he was gay; the Navy never specifically told him that he would be discharged solely on the basis of orientation; and the Navy appeared to enforce its discharge policy mainly in cases of improper conduct.[4] This does not amount to affirmative misconduct, however, as comparison with Watkins makes clear.
 
 
 20
 Watkins had been drafted into the United States Army in 1967, and had reenlisted three times before he was denied reenlistment in 1982 because he was a homosexual. Meanwhile, Watkins had acknowledged his homosexuality on a medical form prior to his initial induction; during his first tour of duty, he had signed an affidavit admitting that he had been a homosexual for years and that since his enlistment, he had engaged in sodomy with two other servicemen; he was investigated on criminal sodomy charges, but the charges were dropped; after he was honorably discharged and his reenlistment eligibility code was listed as "unknown," he requested correction and the code was changed to "eligible for reentry on active duty"; he was reenlisted, and during his second tour, discharge proceedings were brought because of his homosexual tendencies, yet the board found him "suitable for retention in the military service"; he then got a security clearance for "Secret" information, was nevertheless rejected for a position in the Nuclear Surety Personnel Reliability Program because he had admitted homosexual tendencies, but following a request by his commanding officer for reconsideration, was requalified for the position; and, after he worked for several years under the security clearance, it was revoked when he again said he was homosexual, but after still another investigation, Watkins was again reenlisted. In those circumstances we held that the Army "plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins," and its "ongoing active misrepresentations" enabled Watkins to enter, remain, and progress in the Army. Id. at 708.
 
 
 21
 No official, affirmative misconduct of this sort appears in Meinhold's record. There were no "ongoing active misrepresentations" by Navy officials. No one vouched for Meinhold's abilities despite his homosexuality prior to this incident.[5] Meinhold was not told his homosexuality would not be considered in a discharge proceeding, and he had no track record from which he could have assumed that his own homosexuality made no difference to his reenlistment or retention. Thus, the Navy's conduct amounts at most to "[a] mere failure to inform or assist." Lavin v. Marsh, 644 F.2d 1378, 1384 (9th Cir.1981). Compare Watkins, 875 F.2d at 708 (applying standard; finding conduct went beyond it) with Lavin, 644 F.2d at 1383-84 (adopting standard; finding failure to determine pension benefits or correct misunderstanding did not amount to pervasive pattern of false promises and so fell short). As Watkins instructs, standing aside or doing nothing, or even providing misinformation, is insufficient to create estoppel. Watkins, 875 F.2d at 708. For this reason, there is no basis for finding here, as the court did in Watkins, that the Navy repeatedly acted so as to promise Meinhold that he would not be discharged solely because of his sexual orientation. As a matter of law, therefore, Meinhold's estoppel claim must fail.
 
 III
 
 22
 On the merits of Meinhold's equal protection claim, DOD contends that since it is constitutionally permissible to conclude that homosexual conduct adversely affects the military, Beller v. Middendorf, 632 F.2d 788, 811-12 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981), it is equally permissible for the regulations to target those who are likely to engage in homosexual conduct. DOD faults the district court's definition of the pertinent classification for purposes of its equal protection analysis as "gays and lesbians who do not engage in prohibited conduct," arguing instead that under the regulations, the relevant classification is persons who the military reasonably concludes either have committed or are likely to commit homosexual acts based on their admitted "desire" and "propensity" to engage in homosexual conduct. In holding to the contrary, DOD believes the district court failed to test the policy "in light of the purposes [the Navy] sought to achieve," as courts are obliged to do under Rostker v. Goldberg, 453 U.S. 57, 75, 101 S.Ct. 2646, 2657, 69 L.Ed.2d 478 (1981). DOD then suggests that simply by acknowledging his homosexuality, Meinhold admitted under the regulations that he had a "desire" and "propensity" to commit homosexual acts. From this, it urges, the Navy could permissibly infer that he would probably commit such acts, if he had not done so already.
 
 
 23
 We believe that both the Navy's application of its regulations and the district court's equal protection analysis start a step too far down the path. When the constitutional validity of a statute or regulation is called into question, it is a cardinal rule that courts must first determine whether a construction is possible by which the constitutional problem may be avoided. New York City Transit Auth., 440 U.S. at 582 & n. 22, 99 S.Ct. at 1364 & n. 22. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). Indeed, we have said that "a court must construe a statute so as to avoid raising constitutional questions." Tashima v. Administrative Office of the United States Courts, 967 F.2d 1264, 1269 (9th Cir.1992) (emphasis added); see also Northwest Hosp., Inc. v. Hospital Serv. Corp., 687 F.2d 985, 992 (7th Cir.1982) (applying canon to regulation); cf. United States v. Stansell, 847 F.2d 609, 613-16 (9th Cir.1988) (same). Thus, it is incumbent on us to see whether there is some way the regulation can be construed to resolve the matter on a nonconstitutional ground. See New York City Transit Auth., 440 U.S. at 582 & n. 22, 99 S.Ct. at 1364 & n. 22.
 
 
 24
 As we consider the regulation in this case, however, we are guided by another long-settled rule: The military's "considered professional judgment," Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986), is "not lightly to be overruled by the judiciary," Pruitt v. Cheney, 963 F.2d 1160, 1166 (9th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).
 
 
 25
 "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches."Rostker, 453 U.S. at 65-66, 101 S.Ct. at 2652 (quoting Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973)). Our review, therefore, is as deferential as our constitutional responsibilities permit. Id. at 70, 101 S.Ct. at 2654-55.
 
 
 26
 To accommodate both principles, we start with the Navy's professional judgment. It is that "[h]omosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission." DOD Directive 1332.14(H)(1)(a).
 
 
 27
 The regulation, in turn, defines "homosexual" as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." DOD Directive 1332.14(H)(1)(b)(1). "A homosexual act means bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires." DOD Directive 1332.14(H)(1)(b)(3). Eliminating from the equation a person who has previously engaged in homosexual acts because acts were not at issue in Meinhold's proceeding, a "homosexual" according to the regulations is someone who "desires" or "intends" to engage in bodily contact with members of the same sex for the purpose of satisfying sexual desires.
 
 
 28
 Separation may be based on homosexuality due to conduct or statements. DOD Directive 1332.14(H)(1)(c). "Conduct" consists of engaging in, attempting to engage in, or soliciting another to engage in a homosexual act;[6] a "statement" that the member is a homosexual is the basis for separation unless the board finds the member is not a homosexual. Id.
 
 
 29
 There is no dispute in this case that the Navy's policy is constitutionally permissible to the extent it relates to homosexual conduct.[7] However, the issue in Meinhold's separation proceeding was his classification as a homosexual.[8] Thus, our task is to decide whether this application raises constitutional concerns that can be obviated by construing the regulations differently, but still consistently with the purposes DOD sought to achieve.
 
 
 30
 Construing the regulation to apply to the "classification of being homosexual" clearly implicates equal protection. We recognized that the Army's discharge of a servicemember because of her acknowledged homosexuality states an equal protection claim in Pruitt, 963 F.2d at 1164.[9] Here, the regulation as applied to Meinhold assumes that persons who say they are gay, but who have not acted in accordance with their propensity in the past, will nevertheless act in accordance with their propensity in the future--whether or not to do so is lawful or acceptable military behavior. Yet no similar assumption is made with respect to servicemembers who are heterosexual.[10] Although courts defer to the military's judgment about homosexual conduct, and classifications having to do with homosexuality may survive challenge if there is any rational basis for them, see Heller v. Doe, --- U.S. ----, ---- - ----, 113 S.Ct. 2637, 2642-43, 125 L.Ed.2d 257 (1993); High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 571 (9th Cir.1990), at least a serious question is raised whether it can ever be rational to presume that one class of persons (identified by their sexual preference alone) will violate regulations whereas another class (identified by their preference) will not.[11]
 
 
 31
 Equating status or propensity with conduct or acts that are prohibited is problematic as well. The Supreme Court has long recognized the constitutional infirmity of penalizing status alone. See, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 885-87, 95 S.Ct. 2574, 2582-83, 45 L.Ed.2d 607 (1975) (ethnicity is insufficient basis to believe persons are illegal aliens); Robinson v. California, 370 U.S. 660, 665-67, 82 S.Ct. 1417, 1420-21, 8 L.Ed.2d 758 (1962) (unconstitutional to criminalize narcotics addiction in absence of proof of use); cf. Powell v. Texas, 392 U.S. 514, 532-34, 88 S.Ct. 2145, 2154-55, 20 L.Ed.2d 1254 (1968) (recognizing Robinson rule that criminal penalties may be inflicted only if accused has committed act by contrast with status). While not controlling because the discharge process is not a criminal proceeding and does not impose punishment, Garrett v. Lehman, 751 F.2d 997, 1002-03 (9th Cir.1985), Robinson, Powell and Brignoni-Ponce nevertheless point out the constitutionally significant danger of making status a surrogate for prohibited conduct. As Justice Black's concurring opinion in Powell, joined by Justice Harlan, observed:
 
 
 32
 Punishment for a status is particularly obnoxious, and in many instances can reasonably be called cruel and unusual, because it involves punishment for a mere propensity, a desire to commit an offense; the mental element is not simply one part of the crime but may constitute all of it....
 
 
 33
 ... Perhaps more fundamental is the difficulty of distinguishing, in the absence of any conduct, between desires of the day-dream variety and fixed intentions that may pose a real threat to society; extending the criminal law to cover both types of desire would be unthinkable, since "[t]here can hardly be anyone who has never thought evil. When a desire is inhibited it may find expression in fantasy; but it would be absurd to condemn this natural psychological mechanism as illegal."
 
 
 34
 Powell, 392 U.S. at 543-44, 88 S.Ct. at 2159-60 (Black, J., concurring) (quoting Glanville Williams, Criminal Law--the General Part 2 (1961)). And as Justice Harlan wrote in Robinson:
 
 
 35
 Since addiction alone cannot reasonably be thought to amount to more than a compelling propensity to use narcotics, the effect of this instruction was to authorize criminal punishment for a bare desire to commit a criminal act.
 
 
 36
 If the California statute reaches this type of conduct, ... it is an arbitrary imposition which exceeds the power that a State may exercise in enacting its criminal law.
 
 
 37
 Robinson, 370 U.S. at 678-79, 82 S.Ct. at 1426-27 (Harlan, J., concurring). The effect of the regulation as applied in Meinhold's case is much the same. Cf. Jacobson v. United States, --- U.S. ----, ----, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992) (past conduct does not demonstrate propensity to engage in similar conduct later made illegal); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973) (individual's thoughts and fantasies "are his own and beyond the reach of government").
 
 
 38
 Thus, whether the regulation passes constitutional muster is a close question only because of the greater license we give the military to control the military environment. See Beller, 632 F.2d at 810 ("[C]onstitutional rights must be viewed in light of the special circumstances and needs of the armed forces."). Constitutional tensions may be avoided, however, if the regulation can reasonably be construed to mandate separation due to a statement of homosexuality only when that statement itself indicates more than the inchoate "desire" or "propensity" that inheres in status. We believe it can be.
 
 
 39
 DOD's policy judgment hinges on conduct[12]--whereas the separation provisions include "conduct or statements." DOD contends that a statement admitting homosexuality under the regulation admits "desire" and "propensity" to commit homosexual acts. Arguably it does, in the abstract, because the regulatory definition of "homosexual" is a person who "engages in, desires to engage in, or intends to engage in homosexual acts."[13] But as DOD's brief also acknowledges: "[A] service member's expressed 'desire' to commit homosexual [acts] evidences more than an abstract, ephemeral, or suppressible whim. Like acts themselves and like intentions, 'desire' in the relevant sense evidences a 'propensity,' or an 'often intense natural inclination,' Webster's New Collegiate Dictionary 943 (9th ed. 1990), to commit serious regulatory violations." (Emphasis added.) Taking DOD's suggestion at face value, the "statement" prong for separation may turn on something more than status: a concrete, expressed desire to commit homosexual acts which are, in turn, prohibited.
 
 
 40
 This interpretation is consistent with the military's judgment that the presence of persons who engage in homosexual conduct, or make a statement indicating their propensity for engaging in, or attempting to engage in, or soliciting someone else to engage in homosexual acts, impairs the military mission. Nothing in the policy states that the presence of persons who say they are gay impairs the military mission. Rather, the focus is on prohibited conduct and persons likely to engage in prohibited conduct. Construing the regulation to reach only statements which manifest a fixed or expressed desire to commit a prohibited act not only coincides with the military's concern for its mission, but gives content to "desire" apart from the defining characteristic of sexual orientation.
 
 
 41
 We therefore hold that the regulation under which Meinhold was processed need not be construed so broadly as to raise constitutional concerns. It can reasonably be construed to reach only statements that show a concrete, fixed, or expressed desire to commit homosexual acts despite their being prohibited. The Navy applied its regulation to Meinhold's statement of orientation alone and based his separation solely on his classification as a homosexual. His statement--"I am in fact gay"--in the circumstances under which he made it manifests no concrete, expressed desire to commit homosexual acts. The Navy's presumption that Meinhold desires or intends to engage in prohibited conduct on the basis of his statement alone therefore arbitrarily goes beyond what DOD's policy seeks to prevent. Accordingly, Meinhold's discharge on that basis cannot stand.
 
 IV
 
 42
 In addition to rescinding Meinhold's discharge, the district court permanently enjoined DOD from "discharging, changing [the] enlistment status of or denying enlistment to any person," from maintaining files, and from "taking any actions" against gay or lesbian servicemembers based on sexual orientation in the absence of sexual conduct which interferes with the military's mission. The Navy argues that even if the district court did not err on the constitutional issue, its nation-wide injunction cannot stand.[14] We agree.
 
 
 43
 An injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979); see also Bresgal v. Brock, 843 F.2d 1163, 1170-71 (9th Cir.1987). This is not a class action, and Meinhold sought only to have his discharge voided and to be reinstated. Effective relief can be obtained by directing the Navy not to apply its regulation to Meinhold based only on his statement that he is gay. Beyond reinstatement, and not separating Meinhold on that basis, DOD should not be constrained from applying its regulations to Meinhold and all other military personnel. Accordingly, the injunction is vacated except to the extent it enjoins DOD from discharging Meinhold due solely to the statement that he made.
 
 
 44
 JUDGMENT AFFIRMED IN PART; REVERSED AND VACATED IN PART.
 
 
 
 [1]
 The district court's opinion is published. Meinhold v. Department of Defense, 808 F.Supp. 1455 (C.D.Cal.1993)
 
 
 [2]
 DOD Directive 1332.14, 32 C.F.R. Pt. 41, App. A (1981) and Naval Military Personnel Manual 3630400(1) (1992) were in effect at the time of Meinhold's discharge. These regulations have since been changed. This appeal does not involve the so-called "don't ask/don't tell" policy, which became effective February 28, 1994. See 10 U.S.C. Sec. 654 (Supp.1994). We express no opinion as to that policy or the regulations implementing it
 
 
 [3]
 As they read at the time of Meinhold's discharge, Naval Military Personnel Manual 3630400 was essentially identical to DOD Directive 1332.14(H). We shall refer to them together as "the regulation," and cite only to DOD Directive 1332.14
 
 
 [4]
 The parties dispute whether Meinhold was asked by the doctor who performed his physicals at enlistment if he had homosexual tendencies. However, this fact is not material. If the doctor did fail to ask, such a failure amounts to no more than negligence, which is insufficient to create estoppel
 
 
 [5]
 Meinhold submitted declarations by colleagues which said that his homosexuality was common knowledge, but they do not show that anyone knew of it before his reenlistment. Likewise, while there is evidence that his performance was well regarded, there is no evidence that any of his commanding officers commended Meinhold with knowledge of his homosexuality prior to the separation proceedings
 
 
 [6]
 If such conduct is found, the servicemember must be separated unless the board finds that it was a departure from usual behavior, is unlikely to recur, was not accomplished by force, the member's continued presence is consistent with the interest of proper discipline, and the member does not "desire" or "intend" to engage in homosexual acts. DOD Directive 1332.14(H)(1)(c)(1)
 
 
 [7]
 See, e.g., Schowengerdt v. United States, 944 F.2d 483, 486, 489-90 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992); Hatheway v. Secretary of the Army, 641 F.2d 1376, 1378, 1384 (9th Cir.), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); Beller, 632 F.2d at 792, 810
 
 
 [8]
 The Legal Advisor counseled the discharge board: "Also, if I can just add, there seems to be some confusion about the acts, and the classification here. And I think that ... you should completely disregard the acts. There are no allegations whatsoever of act. We're talking specifically about the classification, and not the act. So, even though there--there is mention in that definition of the act, we're not dealing with that here. We are dealing merely with the classifications."
 
 
 [9]
 See also Steffan v. Aspin, 8 F.3d 57 (D.C.Cir.1993), vacated for reh'g en banc, 8 F.3d 70 (D.C.Cir.1994); Cammermeyer v. Aspin, 850 F.Supp. 910, 925 (W.D.Wash.1994) (striking down same policy; calling "presumption that servicemembers with a homosexual orientation will engage in proscribed homosexual conduct" "unfounded"); Dahl v. Secretary of the Navy, 830 F.Supp. 1319, 1334-35 & n. 17 (E.D.Cal.1993) (striking down same regulations; comparing policy to "patently unconstitutional" hypothetical policy excluding ethnic minorities because they have a "propensity" to engage in theft though non-minorities are not excluded until they engage in theft). But see Ben-Shalom v. Marsh, 881 F.2d 454, 463-65 (7th Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (rejecting equal protection challenge); Woodward v. United States, 871 F.2d 1068, 1075-77 (Fed.Cir.1989), cert. denied, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990) (same)
 
 
 [10]
 Prohibited conduct includes adultery, indecent assault, wrongful co-habitation, fraternization, indecent language, indecent acts with another, pandering and prostitution, sodomy and bigamy. Articles 120, 125, 134, Uniform Code of Military Justice, 10 U.S.C. Secs. 920, 925, 934 (Supp.1994)
 
 
 [11]
 We acknowledge the force of DOD's argument that it need not take the risk of a person with homosexual desire or propensity acting on it because of the critical nature of the military mission. See Ben-Shalom, 881 F.2d at 460-61 (rejecting equal protection challenge to discharge of servicemember who admitted homosexuality in part on the footing that the military does not have to take the risk that an admitted homosexual will not commit homosexual acts). But cf. Pruitt, 963 F.2d at 1167 (equal protection challenge withstands Rule 12(b)(6) dismissal). However, DOD is prepared to take the risk that a servicemember who has committed a homosexual act but isn't homosexual won't do so again. For that reason, its argument is not wholly rational. In any event, the risk factor alone does not eliminate equal protection difficulties
 
 
 [12]
 "The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission." DOD Directive 1332.14(H)(1)(a). Our conclusion in Pruitt that the regulation targets homosexual status, 963 F.2d at 1163, is not to the contrary because we were concerned there with whether it targeted speech or status in Pruitt's case
 
 
 [13]
 There is no evidence that Meinhold "engaged" in homosexual acts and DOD doesn't argue that he "intended" to
 
 
 [14]
 DOD also contends that the district court lacked jurisdiction to issue its amended order, which broadened the scope of injunctive relief, because an appeal had already been taken from the original order. As the district court issued the amended order to clarify its original injunction and to supervise compliance in the wake of Meinhold's motion for contempt, it did not lack jurisdiction. See Hoffman v. Beer Drivers & Salesmen's Local Union No. 888, 536 F.2d 1268, 1276 (9th Cir.1976) (appeal from supervisory order does not divest district court of jurisdiction to continue supervision and modify order as necessary)